**MID–WEST PAPER PRODUCTS COMPANY, Appellant in No. 78–1736,**

v.

**CONTINENTAL GROUP, INC., American Bag and Paper Corporation, Chase Bag Company, Harley Corporation, St. Regis Paper Company.**

**SHOPPING CART, INC., Individually and on behalf of all others similarly situated, Appellant in No. 78–1746,**

v.

**CONTINENTAL GROUP, INC., American Bag and Paper Corporation, Chase Bag**

Company, Harley Corporation, St. Regis Paper Company.

**86TH STREET FOOD SPECIALTY, INC., C. G. Dairies, Inc. and 3 J'S Farms, Inc., Appellants in No. 78–1776,**

v.

**CONTINENTAL GROUP, INC., American Bag and Paper Corporation, Chase Bag Company, Harley Corporation, St. Regis Paper Company.**

**MURRAY'S OF BAEDERWOOD, INC., on behalf of itself and all others similarly situated, Appellant in No. 78–1796,**

v.

**CONTINENTAL GROUP, INC., American Bag and Paper Corporation, Chase Bag Company, Harley Corporation, St. Regis Paper Company.**

**Nos. 78–1736, 78–1746, 78–1776 and 78–1796.**

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1978.

Decided March 26, 1979.

As Amended April 5, 1979.

Mitchell A. Kramer (argued), Steven Kapustin, Stuart Peim, Kramer & Salus, Philadelphia, Pa., for appellant Mid-West Paper Products Co.

Patrick T. Ryan (argued), William J. Lehane, Wilson M. Brown, III, Drinker, Biddle & Reath, Philadelphia, Pa., Larry L. Williams, Clifford, Warnke, Glass, McIlwain & Finney, Washington, D. C., for appellee Continental Group, Inc.

Arnold Levin (argued), Josephine Stamm, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., Richard J. Molish, Langhorne, Pa., for appellant Shopping Cart, Inc.

Edward C. German, Joseph Manta, Philip A. Ryan, LaBrum & Doak, Philadelphia, Pa., for appellee American Bag and Paper Corp.

Richard D. Greenfield, Bala Cynwyd, Pa., Philip Stephen Fuoco, Haddonfield, N. J., Eric L. Keisman, Wolf, Popper, Ross, Wolf & Jones, New York City, for appellants 86th Street Food Specialty, Inc., C. G. Dairies, Inc., and 3 J's Farms, Inc.

Henry T. Reath (argued), Michael M. Baylson, Peter J. Hoffman, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee Chase Bag Co.

Bernard M. Gross, Warren Rubin (argued), Gross & Sklar, P. C., Philadelphia, Pa., for appellant Murray's of Baederwood, Inc.

Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., Michael L. Denger, Sutherland, Asbill & Brennan, Washington, D. C., for appellee Harley Corp.

Ralph W. Brenner (argued), T. Michael Mather, Steven R. Fischer, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., H. Richard Wachtel, Grant S. Lewis, LeBoeuf, Lamb, Leiby & MacRae, New York City, for appellee St. Regis Paper Co.

Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal we are called upon to apply the teaching of *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), to a number of settings, all in the context of a series of antitrust actions brought against manufacturers of consumer bags, alleging illegal price fixing under the Sherman Act and seeking both treble damages and injunctive relief. Because none of the plaintiffs purchased bags directly from the defendants, the district court relied on the holding in *Illinois Brick* that indirect purchasers from antitrust violators may not as a general matter sue for treble damages, granted defendants' motions for summary judgment, and dismissed the suits in their entirety.

With respect to all the plaintiffs, excepting only Mid-West Paper Products Company, we agree with the district court that *Illinois Brick* bars their claims for treble damages. But in our view such plaintiffs may still seek injunctive relief. We also believe that summary judgment on Mid-West's suit is inappropriate—at least at this time.

## I. FACTUAL AND PROCEDURAL HISTORY

These private antitrust actions were instituted in the wake of a grand jury indictment charging five corporations and seven individuals engaged in the manufacture of consumer bags with fixing prices in violation of section 1 of the Sherman Act.[1]

The criminal indictment, the language of which was closely tracked in the complaints filed in the private civil actions, described consumer bags as single or multilayered paper bags that may also contain linings or coatings made from other materials and that are employed to prepackage products then marketed in them. Consumer bags are designed for capacities of less than twenty-five pounds. They often have printed exterior designs describing their contents and are used for packaging a variety of products, including pet foods, cookies, tea, coffee, and chemicals.

Plaintiffs in the civil actions fall into three categories: The first group, which includes Shopping Cart, Inc., 86th Street Food Specialty, Inc., C. G. Dairies, Inc. and 3 J's Farms, Inc., consists of supermarkets and retail grocery stores that do not purchase consumer bags directly from the defendants or from anyone else, but purchase products that are packaged in consumer bags for resale to their customers.

In the second category is Murray's of Baederwood, Inc. (Murray), a grocery store and delicatessen that sells products packaged in consumer bags, and also purchases empty consumer bags in which it packages its own brand of ice cream. The bags admittedly are not purchased directly from

1. Of the five corporations indicted, two entered pleas of nolo contendere, two were convicted after jury trials, and one was found not guilty by the jury. *United States v. Continental Group, Inc.*, 456 F.Supp. 704 (E.D.Pa.1978). In addition to the criminal actions, the government filed a civil suit seeking injunctive relief, Civ. No. 76–3377 (E.D.Pa.), and several direct purchasers have sued for treble damages and injunctive relief.

any of the defendants, but are for the most part bought from middlemen and wholesalers. However, one of Murray's officers suggested in a deposition that one of the firms from which Murray purchases bags "is a paper supplier and it's possible they manufacture. I don't know."[2] Together, the first two classifications will be referred to as the "supermarket plaintiffs."

Finally, there is Mid-West Paper Products Company (Mid-West), a middleman that purchases bags for resale to automobile manufacturers, which in turn put machine parts in the bags. Mid-West buys bags directly from various manufacturers, including Great Plains Bag Company (Great Plains), a subsidiary of defendant Continental Group, Inc. The parties are in dispute whether these bags are properly denominated consumer bags, rather than kraft bags.

Named as defendants in these actions are the five corporations listed in the criminal indictment: Continental Group, Inc., American Bag and Paper Corp., Chase Bag Co., Harley Corp., and St. Regis Paper Co. The cases involved in this appeal as well as other suits were consolidated for trial in the Eastern District of Pennsylvania, where plaintiffs sought certification to represent a class, and asked for treble damages and injunctive relief.

The district judge at first limited discovery to matters relevant to the class certification question. After the Supreme Court's decision in *Illinois Brick*, however, the judge requested the parties to show cause why the cases should not be dismissed because of that precedent. On April 5, 1978, summary judgment was granted in favor of the defendants on the authority of *Illinois Brick*. The order was not accompanied by an opinion. Plaintiffs filed a timely appeal.

**2.** App. 231a.

**3.** Section 4 of the Clayton Act, 15 U.S.C. § 15 provides:

    Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United

## II. *Illinois Brick*

According to Justice White, the author of the *Illinois Brick* opinion, the result there was logically compelled by the Court's earlier decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe,* a company that had illegally overcharged its customers was sued by one of them for treble damages under § 4 of the Clayton Act.[3] It was determined there that as a matter of law an antitrust violator may not, as a general matter, interpose as a defense that the direct purchaser has not been injured because it had passed on the illegal overcharge to its own customers. As described in *Illinois Brick,* the Court in *Hanover Shoe*

    held that except in certain limited circumstances, a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and that the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge. 392 U.S., at 494, 88 S.Ct. at 2232. The first reason for the Court's rejection of this offer of proof was an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge. *Id.,* at 492–493, 88 S.Ct. at 2231. A second reason for barring the pass-on defense was the Court's concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality" because indirect purchasers "would have only a tiny stake in the lawsuit" and hence little

States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

incentive to sue. *Id.,* at 494, 88 S.Ct. at 2232.[4]

With *Hanover Shoe* already foreclosing the defensive use of "pass-on" except in limited circumstances, the Court in *Illinois Brick* adopted a rule of symmetry with respect to the offensive use of "pass-on", thereby barring indirect purchasers from suing for treble damages whenever the antitrust defendant would be precluded from asserting the pass-on defense against a direct purchaser.

The Court reasoned that symmetry was required to protect defendants from the serious risk of multiple liability.[5] Also, it considered the "principal basis for the decision in *Hanover Shoe* "—the perception that it would greatly complicate and reduce the effectiveness of treble damages proceedings if they were to include an analysis of the price and output decisions of a direct purchaser to determine how much of the illegal overcharge was absorbed by it and how much was passed on—to be equally applicable to the assertion of pass-on theories by plaintiffs.[6] In sum, *Illinois Brick* concluded: "Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers." [7]

Under *Hanover Shoe* and *Illinois Brick,* however, the pass-on theory may still be used, offensively or defensively, in the limited circumstances when tracing the interaction of market forces is unnecessary. Of relevance here, and the only situation clearly delimited by the Supreme Court,[8] is an exception carved out for the situation where there is a pre-existing, fixed-quantity, cost-plus contract between the direct purchaser and its customer, as well as between all other parties in the distribution chain from the direct purchaser to the plaintiff, so that the plaintiff has absorbed the illegal overcharge in its entirety.

In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.[9]

---

**4.** 431 U.S. at 724–26, 97 S.Ct. at 2064 (footnotes omitted).

**5.** Such risk was described as follows:
Even though an indirect purchaser had already recovered for all or part of an overcharge passed on to it, the direct purchaser would still recover automatically the full amount of the overcharge that the indirect purchaser had shown to be passed-on; similarly, following an automatic recovery of the full overcharge by the direct purchaser, the indirect purchaser could sue to recover the same amount.
*Id.* at 730, 97 S.Ct. at 2067.

**6.** *Id.* at 731–33, 97 S.Ct. at 2068.

**7.** *Id.* at 737, 97 S.Ct. at 2070.

**8.** In a footnote the Court commented, "another situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer." *Id.* at 736 n.16, 97 S.Ct. at 2070. We relied on this remark to fashion an exception to the *Illinois Brick* rule in *In re Sugar Industry Antitrust Litigation (Stotter & Co., Inc. v. Amstar Corp.),* 579 F.2d 13 (3d Cir. 1978), where although the plaintiff purchased directly from a division (as well as from a subsidiary) of two of the alleged offenders, it did not buy the price-fixed product itself but rather, a product that incorporated the price-fixed product as one of its ingredients. *See* discussion in Part III.C. *infra.*

**9.** 431 U.S. at 736, 97 S.Ct. at 2070. Under a cost-plus contract a product is sold at a specified markup above the seller's own cost. The supermarket plaintiffs submit that this exception should be interpreted expansively so as to permit recovery even if the pre-existing cost-plus contract does not fix the quantity of goods to be purchased. Under such circumstances, plaintiffs point out, it is always true that the illegal profit earned by defendants is traceable in its entirety to the indirect purchaser. Also, plaintiffs suggest, the exception should be stretched to include informal arrangements and patterns of cost-plus pricing. Nevertheless, we are bound by the clear dictate of *Illinois Brick* and may not extend the exception beyond the limited circumstances recognized by the Supreme Court. The Court explicitly rejected any exception for "cost-based rules of thumb" and

Like many Supreme Court decisions that are the product of a system in which the cases to be reviewed are carefully selected, *Illinois Brick* not only addresses the immediate problem presented, it also serves as a guidepost for future litigation. Accordingly, we frame our response to the issues raised in this appeal with an eye toward blending with and complementing the themes that have been accentuated by the High Court. Thus, we must determine first, whether any of the supermarket plaintiffs qualify under the cost-plus contract exception so as to be in a position to sue defendants for treble damages. Second, although the *ratio decidendi* in *Illinois Brick* focused upon the narrow issue of the necessity for symmetrical application of defensive and offensive use of the pass-on theory, defendants contend that that decision has broad implications regarding the general question of standing to sue. Therefore, we are required to assess whether *Illinois Brick* bars suits by purchasers from competitors of the antitrust defendants who allege that defendants' anticompetitive activity made it possible for their competitors to charge higher prices, thereby injuring plaintiffs. Third, it is necessary that we ascertain whether indirect purchasers, who may not sue for treble damages under § 4, may nonetheless seek injunctive relief under § 16.

## III.  TREBLE DAMAGE CLAIMS

### A.  *Indirect Purchasers*

■ It is evident that none of the plaintiffs grouped in the first category—supermarkets that purchased consumer bags only indirectly from the defendant manufacturers—may maintain actions for treble damages unless they can prove that there were pre-existing, fixed-quantity, cost-plus contracts at each level of distribution between the direct purchasers from the defendants and the plaintiffs, and that therefore they have absorbed the illegal overcharge in its entirety. Similarly, to prevail on one of its theories, Murray must establish the existence of cost-plus contracts at each level of distribution. The district court apparently concluded on the basis of the documents before it that the plaintiffs could not prove that such contracts existed and that since there was no genuine issue as to any material fact, the defendants were entitled to judgment as a matter of law. On appeal, the supermarkets argue that summary judgment was inappropriate inasmuch as discovery with respect to the merits of the controversy had not yet proceeded, and since it was still possible for them to prove that they qualify under the cost-plus exception.

Any review of the propriety of a grant of summary judgment at the early stages of discovery is instructed by an appreciation of

other informal arrangements. *See id.* at 743–44, 97 S.Ct. 2061. Furthermore, the Court has deemed it to be legally significant that when a cost-plus contract does not specify a fixed quantity of goods, the direct purchaser may suffer a loss in sales to its customers and seek damages for its losses, thereby complicating the allocation of the recovery. *See id.* at 736, 97 S.Ct. 2061. But rather than instruct that whenever a direct purchaser sells under a variable quantity cost-plus contract, the indirect purchaser to whom the entire burden of the overcharge is traceable may sue for treble damages in the full amount while the direct purchaser may sue separately for additional damages attributable to lost sales, the Supreme Court evidently has concluded that even in such circumstances, the entire overcharge, multiplied threefold, is to be awarded to the direct purchaser. The Court's approach is understandable in that it avoids the complexities that would inevitably result from an alternative rule, such as that urged by the supermarket plaintiffs, since under an alternative rule, inquiry would have to be made into each sale consummated by the direct purchaser to ascertain the terms under which it was made and determine accordingly who may sue for recovery. Even more important, by adopting a general rule with a very circumscribed exception the Court has ensured that under all circumstances there will be an incentive for direct purchasers to sue, a factor that, in the Court's view, is necessary to promote effective enforcement of the antitrust laws, *see e. g., id.* at 734–35, 97 S.Ct. 2061. *See* Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm. & Mary L.Rev. 883, 916–18, 925–26 (1975); Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation,* 63 Cornell L.Rev. 309, 329–30 (1978); Note, *The Supreme Court, 1976 Term,* 91 Harv.L.Rev. 70, 229–30 (1977).

the nature of the trial process in federal courts. The Federal Rules of Civil Procedure are designed "to put an end to the 'sporting theory of justice,' by which the result depends on the fortuitous availability of evidence or the skill and strategy of counsel." [10] One cornerstone of this scheme is the discovery apparatus, through which the issues in dispute may be isolated, defined, and clarified before trial and through which a party may ascertain what evidence, if any, his opponent intends to introduce on each issue.[11] It has been recognized, however, that the liberal discovery devices still leave ample room for strategic maneuvering by counsel. Protracted discovery could be used by a wealthy party to coerce an adversary with limited resources into submission.[12] Also, as the Supreme Court has warned,

> to the extent that [discovery] permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.[13]

Often, there will be no easy solution to the problem presented by an overuse of discovery. But, at times, a remedy may be had through summary judgment, another cornerstone of civil procedure, by which the protracted pretrial process may be brought to a prompt adjudication "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [14] This device has considerable utility, because although the non-moving party is entitled to the benefit of all reasonable doubts and inferences,[15] "[w]hen a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." [16] Summary judgment, when appropriately granted, has been upheld even in antitrust actions,[17] where summary procedures traditionally are "sparingly" used.[18]

In their effort to forestall final dismissal of their claims for treble damages, the supermarket plaintiffs are able to adduce only two sets of facts. First, they direct the Court's attention to the deposition of an officer of Shopping Cart, in which he stated that Shopping Cart acquires the bulk of its merchandise from its major supplier under a cost-plus arrangement. Second, the supermarket plaintiffs point out that Shopping Cart moved to compel defendants to answer interrogatories and to produce documents that were claimed to be necessary for Shopping Cart to establish that similar cost-

---

**10.** 8 Wright & Miller, Federal Practice and Procedure § 2001 at 18–19 (1970).

**11.** *See, e. g., Hickman v. Taylor*, 329 U.S. 495, 500, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

**12.** *See, e. g., SCM Societa Commerciale S.P.A. v. Industrial & Commercial Research Corp.*, 72 F.R.D. 110 (D.C.Tex.1976).

**13.** *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975).

**14.** Fed.R.Civ.P. 56(c).

**15.** *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); 10 Wright & Miller, Federal Practice & Procedure § 2727 (1973).

**16.** Fed.R.Civ.P. 56(e). *See also First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sound Ship Building Corp. v. Bethlehem Steel Co. (Inc.)*, 533 F.2d 96, 99–100 (3d Cir. 1976); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir. 1975).

**17.** *See e. g., First Nat'l Bank of Arizona, supra; Sound Ship Building Corp., supra.*

**18.** *See Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

plus arrangements existed at the other levels of distribution,[19] but that the district court dismissed the suits without deciding the motion.

However, in our view, the record amply demonstrates that there is no genuine issue regarding the material fact whether there are pre-existing, fixed-quantity, cost-plus contracts at each level of distribution. Shopping Cart, the only supermarket plaintiff that even purports to come within the cost-plus exception, conceded in a deposition of one of its officers that it does not have fixed-quantity contracts with its major supplier. Rather, it has only an informal oral arrangement, and its orders vary and are usually based on consumer demand during the prior week.[20] Indeed, the position taken by the supermarkets and admitted at oral argument is that it is sufficient for them to prove that there were pre-existing cost-plus arrangements, and that it is not necessary, nor are they prepared, to prove

that any such arrangements were reduced to a formal contract or that they were for fixed quantities of goods. This stance is manifestly not in accordance with the dictate of *Illinois Brick*.[21] Under such circumstances, plaintiffs may not, consonant with the summary judgment procedure, insist upon taking a roundabout, lengthy, and costly discovery route before submitting to the inevitable conclusion that their actions for treble damages cannot prevail.[22]

## B. *Murray's of Baederwood*

In addition to arguing that it comes within the cost-plus exception,[23] Murray advances the theory that it may sue for treble damages because of injuries it suffered as a direct purchaser of consumer bags from competitors of the defendants,[24] who allegedly were able to charge artificially inflated prices as a consequence of defendants' price-fixing.[25] Murray concedes that *State of Washington v. American Pipe and*

19. Shopping Cart sought to compel the defendants to disclose the names and addresses of all direct purchasers of consumer bags since 1950. It maintains that this information is necessary for it to ascertain whether any of the direct purchasers sold to Shopping Cart's supplier under a "cost-plus arrangement", as well as whether any of the direct purchasers were owned or controlled by the defendants so as to "establish direct overcharges to the plaintiff which were unaffected by market forces." App. 558a.

20. *See* App. 492a (Shopping Cart). The absence of fixed-quantity cost-plus contracts between the other supermarket plaintiffs and their suppliers is also apparent. *See* App. 254a (Murray's of Baederwood); 279a–280a, 302a, 307a–308a (C. G. Dairies); 325 (3 J's Farms); 391a–392a (86th Street).

21. *See* note 9 and accompanying text *supra*.

22. *Cf. George C. Fry Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 556 (2d Cir. 1977); *Donofrio v. Camp*, 152 U.S.App.D.C. 280, 283–84, 470 F.2d 428, 431–32 (1972) (both cases indicating that plaintiffs have no right to continue discovery when suit is groundless).

23. *See* Part IIIA *supra*.

24. Apparently Murray believes that *Illinois Brick* would preclude indirect purchasers from competitors of the defendants from suing. Al-

though this is a possibility, it is by no means a foregone conclusion. The *Hanover Shoe-Illinois Brick* rule is predicated in part on the perceived need to concentrate the recovery in direct purchasers from the defendants so that there be one group with an incentive to sue and enforce the antitrust laws. *See* text at note 4 *supra*. If ever confronted with the issue, the Supreme Court may well conclude that there is no reason to give an added incentive to sue to direct purchasers from competitors of the defendants, and consequently no reason to deviate from the general rule that a plaintiff may recover only for harm sustained by it. *See also* note 46 *infra*.

25. Murray's argument is premised upon the uncontroverted averment in the deposition of one of its officers that "it's possible" that one of its suppliers of consumer bags also manufactures the bags. *See* app. 231a. It may well be that this would be proven false after further discovery, and that consequently Murray is in fact not a direct purchaser from a competitor of the defendants. But defendants, upon whom the burden rests to show that no dispute exists as to a material fact, have not met their burden in this regard, and we therefore must accept the uncontroverted statement of Murray's officer as true for purposes of reviewing the district court's grant of summary judgment. *See Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972).

*Construction Co.,* 280 F.Supp. 802 (W.D. Wash.1968), is the only case that supports this position. There, plaintiffs charged that "the alleged conspiracy raised the general price level in the market, and that non-conspirators sold their product under this umbrella at higher prices than would have prevailed absent the illegal activity." [26] The district court in *State of Washington* denied the defendant's motion to dismiss all claims based on transactions with non-conspirators for lack of standing to sue, holding that causation was a question to be resolved by the jury and that the alleged injury was not too remote to support recovery. Applying the "target area" test established by the Ninth Circuit for § 4 standing—whether the injury occurred within the " 'area [of economic activity] which it could reasonably be foreseen would be affected' by the anti-trust violation" [27]—the district court concluded that the purpose and foreseeable consequence of the alleged conspiracy was to raise the market price of the commodity in question by eliminating competition among the conspirators.

A literal reading of § 4 might arguably support Murray's contention, because it affords treble damage relief to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws." As the Supreme Court has noted, however, notwithstanding the apparent breadth of this provision, the district and circuit "courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." [28] In addition, it has been recognized that "[a]ntitrust violations admittedly create many foreseeable ripples of injury to individuals, but the law has not allowed all of those merely affected by the ripples to sue for treble damages." [29] Therefore, a § 4 standing doctrine has been forged so as to confine the availability of treble damages "to those individuals whose protection is the fundamental purpose of the antitrust laws." [30] Traditionally, such parties have been identified under the alternative techniques of measuring the directness of the

**26.** 280 F.Supp. at 805.

**27.** *Id.* at 807, *quoting Hoopes v. Union Oil Co. of Calif.,* 374 F.2d 480, 485 (9th Cir. 1967) and other Ninth Circuit cases. Originally, the "target area" test was framed as encompassing plaintiffs who were within "that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *See Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51, 55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). The injection of a foreseeability concept into the description of "target area"—as occurred in *State of Washington* and some Ninth Circuit cases—has been roundly criticized. Thus, for example, Professors Areeda and Turner have observed:

> There is something to be said for excusing the defendant from damage liability for injuries that he neither intended nor could reasonably foresee. The law of torts often grants that excuse, and punitive treble damages create even more reason to do so. But query whether all reasonably foreseeable injuries should be recognized for antitrust purposes. What is foreseeable or even intended is not necessarily appropriate for antitrust protection.

2 P. Areeda & D. F. Turner, Antitrust Law ¶ 334d at 165–66 (1978). *See also* Berger & Bernstein, *An Analytical Framework for Anti-*

*trust Standing,* 86 Yale L.J. 809, 835 (1977); Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review,* 71 Colum.L.Rev. 1, 28–30 (1971).

**28.** *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). Interestingly enough, while approving the judicial creation of a treble damage standing doctrine, *see id.,* the Supreme Court has for the most part abstained from participating in the formulation of its content, permitting the lower courts to struggle on their own with the difficult task of identifying the contours of such doctrine. *See* Berger & Bernstein, *supra* note 27, at 841–42.

**29.** *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 499 (9th Cir. 1977). *See also Calderone Enterprises, Inc. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295–96 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

**30.** *Cromar v. Nuclear Materials and Equipment Corp.,* 543 F.2d 501, 505 (3d Cir. 1976), *quoting In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122, 125 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

injury and asking whether they fall within the "target area" of the violation.[31]

Judge Garth, in *Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501 (3d Cir. 1973), carefully surveyed the development in this Court of the doctrine of standing to assert a claim for treble damages. He concluded that the cases previously decided "create no binding test that is determinative of standing." "[R]egardless of the name given to a particular test or standard," he continued, the precedents are to be understood as representing a functional analysis of the factual context presented in each case.

> so as to preserve the effectiveness of the treble damage remedy without overextending its availability. The plaintiffs' relationship to the alleged violator of the antitrust laws—the directness or indirectness of the injury—as well as the plaintiff's position in the area of the economy threatened by the alleged anticompetitive acts are among the factors to be considered in resolving standing. No single formula captures the many considerations involved in determining whether the plaintiff is one "whose protection is the fundamental purpose of the antitrust laws." *In re Multi-district Vehicle Air Pollution, supra* [481 F.2d] at 125.[32]

As Judge Gibbons observed on a later occasion, this approach "recognizes that § 4 standing analysis is essentially a balancing test comprised of many constant and varia-ble factors and that there is no talismanic test capable of resolving all § 4 standing problems."[33]

Although it would not be feasible to make a comprehensive list of the factors that must be considered in evaluating each standing problem, a number may be identified, particularly when attention is focused upon a concrete factual configuration. Indeed, in applying a functional analysis to determine whether Murray has standing in its role as a purchaser from a competitor of the defendants, we may beneficially rely upon considerations emphasized by the Supreme Court when dealing with two other matters. These issues, the definition of antitrust injury[34] and the use of pass-on theories,[35] although "analytically distinct" from standing,[36] are nevertheless related in that they, too, implicate the enforcement of the antitrust laws. For standing, pass-on, and antitrust injury each address different aspects of the problem of determining when a person is sufficiently "injured in his business or property by reason of anything forbidden in the antitrust laws," so as to be eligible to sue for treble damages. Together, they constitute the judicial gloss upon the words of § 4 by which the courts have patrolled the portals to a treble damage action.

Underlying the precepts that guard access to § 4 is the recognition that the treble damage action represents a congressional

---

**31.** See *In re Multidistrict Vehicle Air Pollution Litigation M. D. L. No. 31, supra*, 481 F.2d at 126–28 (collecting both direct injury and target area cases). Considering both tests to be too restrictive, the Sixth Circuit recently applied a "zone of interests" test, drawn from the administrative law context. See *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975). For an historical summary and discussion of these tests, see generally, Berger & Bernstein, *supra* note 27, at 813–35.

**32.** 543 F.2d at 508–09.

**33.** *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 99 (3d Cir. 1977), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1978).

**34.** See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**35.** See *Illinois Brick, supra; Hanover Shoe, supra.*

**36.** See *Illinois Brick*, 431 U.S. at 728 n.7, 97 S.Ct. 2061 (discussing pass-on and standing). See also Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 994–97 (1977), who concludes his discussion of the interrelationship between these concepts and the implications that they may have for one another with the remark that, "while all three doctrines rest on similar common sense notions of what is practical and fair, it is nevertheless wise to apply each of them separately in terms of its own history, logic, and purpose."

choice that the antitrust laws be enforced in large measure by "private attorneys general" who are encouraged to sue by the prospect of recovering three times their actual damages.[37] Accordingly, whether the issue is the definition of injury in § 4, or the use of pass-on theories, or the proper scope of the standing doctrine, the line-drawing that necessarily takes place is informed by an inquiry into what posture best effectuates the dual purposes of the treble damage remedy, namely, compensating victims of antitrust violations for their injuries and deterring violators by depriving them threefold of "the fruits of their illegality,"[38] while at the same time furthering the overriding goal of the antitrust laws—preserving competition.[39] Aside from these basic objectives of antitrust enforcement, which occasionally are at odds with one another, additional concerns must be addressed in determining whether antitrust goals would be furthered by adopting a particular position. Among such concerns are whether a duplicative or ruinous recovery will result[40] and whether resolution of the claim will unduly complicate the trial by necessitating the pursuing of complex and conjectural economic lines of causation and effect.[41]

Turning now to the situation presented by Murray—whether a direct purchaser from a competitor of the defendants "is one whose protection is the fundamental purpose of the antitrust laws" so as to have standing to sue—it may be assumed arguendo that Murray has been harmed in some way by the *economic impact* of de-

fendants' price-fixing conspiracy. In the same vein, viewing Murray's position in the area of the economy threatened by defendants' alleged anticompetitive acts, it may be that Murray is within that level of the economy, consisting of purchasers of consumer bags, threatened by the price-fixing conspiracy. Both these points find support in Murray's theory that the defendants created an "umbrella" under which their competitors were able to charge higher prices than otherwise. Their significance is questionable, however, in light of the tenuous line of causation between defendants' price-fixing and the prices paid by Murray. Moreover, other factors indicate that Murray is not among those "whose protection is the fundamental purpose of the antitrust laws."

Murray is not in a direct or immediate relationship to the antitrust violators: The defendants secured no illegal benefit at Murray's expense; their tainted gains were reaped from those firms to which they actually sold their products; and Murray's added costs, if any, were pocketed by defendants' competitors, who presumably were free to charge a lower price if they so desired. In that "the law has not allowed all of those merely affected by the ripples to sue for treble damages,"[42] we must inquire further whether Murray's injury should be held legally imputable to the defendants, and whether defendants should be required to pay damages for benefits derived by others and for an occurrence that did not advantage them.

**37.** *See Hawaii v. Standard Oil Co., supra,* 405 U.S. at 262, 92 S.Ct. 885.

**38.** *See e. g., Pfizer, Inc. v. Government of India,* 434 U.S. 308, 314, 98 S.Ct. 584, 54 L.Ed.2d 567 (1978); *Illinois Brick, supra,* 431 U.S. at 746, 97 S.Ct. 2061; *Brunswick Corp. v. Bowl-O-Mat, Inc., supra,* 429 U.S. at 485–86, 97 S.Ct. 690. *See also Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138–39, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

**39.** *See, e. g., Northern Pacific Ry. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Standard Oil Co. v. FTC,* 340 U.S. 231, 249, 71 S.Ct. 240, 95 L.Ed. 239 (1951).

**40.** *See, e. g., Illinois Brick, supra,* 431 U.S. at 730–31, 97 S.Ct. 2061; *Hawaii v. Standard Oil Co., supra,* 405 U.S. at 262–64, 92 S.Ct. 885; *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir. 1975); *Calderone Enterprises Corp., supra,* 454 F.2d at 1295.

**41.** *See, e. g., Illinois Brick, supra,* 431 U.S. at 731–33, 97 S.Ct. 2061; *Hanover Shoe, supra,* 392 U.S. at 492–94, 88 S.Ct. 2224. *See generally* Berger & Bernstein, *supra* note 27, at 845–58 (identifying policies relevant to antitrust standing).

**42.** *See* text accompanying note 29 *supra.*

The question whether Murray's injury should be legally attributable to the defendants depends in some measure on whether and how accurately [43] Murray's alleged injury is economically traceable to the defendants. That issue in turn parallels the pass-on issue raised in *Illinois Brick* because in both situations the plaintiff seeks to recover for higher prices set by, and paid by it to, parties other than the defendants. And the rationale underlying *Illinois Brick*—that it would be almost impossible, and at the very least unwieldy, to attempt to trace the incidence of the anticompetitive effect of defendants' conduct—bears even greater truth in the context of a purchaser from a competitor of the defendants. For, although the dissenting opinion apparently assumes otherwise, it cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge.

The outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural. As noted in *Hanover Shoe*, "[a] wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different . . . , he would have chosen a different price." [44] Insofar as cost of production is an element in arriving at a price, each manufacturer operates at a different level of efficiency and sustains at least slightly varying expenses, thereby incurring different costs in creating the finished product. And in addition to actual cost, pricing decisions are based on various other considerations, such as marketing strategy and elasticity of demand. Although in selecting a price for its product a manufacturer must also take into account the market price for comparable items, to some extent its pricing decisions remain unaffected by the prices charged by others. This is so because of entry and exit conditions in the industry, the degree of interchangeability among the products, and time lags in adjusting to changes in output, price and demand in the market, to name just a few factors. Thus, the competitors of the price-fixers may well have charged the same price notwithstanding the conspiracy, and purchasers such as Murray would be hard pressed to prove otherwise. Indeed, given the fact that economists have difficulty explaining the patterns of interdependence in any oligopolistic industry, which itself is invariably a necessary condition for successful price-fixing, it cannot be said that the noncompetitive pricing behavior of any manufacturer would not have taken place absent the conspiracy. [45]

**43.** In order to recover treble damages, Murray must prove actual causation—that it has been harmed by the defendants' infraction of the antitrust laws—with "reasonable certainty." *See Pitchford v. Pepi*, 531 F.2d 92, 104–05 (3d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Rea v. Ford Motor Company*, 497 F.2d 577, 589 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Once Murray proves that it has been harmed, "the trier of fact may make a reasonable estimate of damages," *id.*, though there reaches a point at which it must be conceded that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 160, 122–24, 89 S.Ct. 1562, 23 L.Ed.2d 129

(1969). *See generally*, P. Areeda & D. F. Turner, *supra* note 27, at ¶ 335a; ¶ 343.

**44.** *Hanover Shoe, supra*, 392 U.S. at 492–93, 88 S.Ct. at 2231.

**45.** Admittedly, at least in an oligopolistic market, a price-fixing arrangement creates an umbrella under which a competitor may safely raise its prices without fear of a corresponding decrease in demand for its product. But in order to prevail, a purchaser from a competitor must prove more than the creation of an umbrella; it must also establish the more difficult proposition that its supplier would have sold to it at a lower price had the conspiracy not existed. On oligopolistic market structures, *see generally* L. Sullivan, Antitrust §§ 61, 115–17 (1977) and authorities cited therein; 2 P. Areeda & D. F. Turner, *supra*, note 27 at ¶ 404; Posner, *Oligopoly and the Antitrust Laws: A*

Apart from its speculative nature, any attempt to determine the effect of defendants' overcharges upon their competitors' prices would transform this antitrust litigation into the sort of complex economic proceeding that the *Illinois Brick* Court was desirous of avoiding if at all possible.[46] And as we read that decision, it is not only possible but imperative that such a transformation not occur in the present case. *Illinois Brick* represents in effect the proposition that when defendants have fixed prices above the competitive market price, where the benefit derived by them is readily ascertainable, the objectives of the treble damage action are fulfilled when the defendants are required to pay the direct purchasers three times the overcharge.[47] As explained in *Illinois Brick*, such an award not only deprives the violators of all the "fruits of their illegality" and deters further wrongdoing, it also compensates those victims who are most likely to assume the mantle of private attorneys general for the injuries they suffered. And by concentrating the entire award in the hands of the direct purchasers in all but unusual circumstances and thereby giving them an incentive to sue, effective and vigorous enforcement of the antitrust laws is, so far as the Supreme Court is concerned, for all practical purposes assured.[48] Once direct purchasers are singled out as the group " 'whose protection is the fundamental purpose of the antitrust laws' " in such nonpredatory price-fixing conspiracies and, through them, the objectives of the treble damage action are fulfilled, there appears to be little reason to expand the standing doctrine in a manner that would require complex and ultimately unrewarding economic analyses at trial, particularly where, as here, such analyses invariably are a prerequisite to establishing that the plaintiff has suffered compensable injury altogether.[49] In fact, given the result in *Illinois*

*Suggested Approach*, 21 Stan.L.Rev. 1562, 1571 (1969); Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655 (1962).

**46.** In addition, if a court were unwilling to extend the *Hanover Shoe-Illinois Brick* rule to the context of a suit by purchasers from competitors, *see* note 24 *supra*, the complexities would be greatly multiplied, as plaintiffs would also be required to establish what portion of the alleged overcharge was absorbed by them.

**47.** A different problem is presented where prices are fixed below the competitive market price or where defendants engage in other forms of anticompetitive conduct, such as group boycotts, vertical restrictions, or monopolization, since defendants' benefits in those instances are not so readily ascertainable, and may not be sufficient to compensate "those individuals whose protection is the primary purpose of the antitrust laws." In such circumstances courts have awarded damages based upon the amount of injury suffered by the plaintiff rather than the benefits derived by the defendants. *See, e. g., Pitchford v. Pepi, supra*, 531 F.2d at 107–09.

**48.** *See* 431 U.S. at 745–46, 97 S.Ct. 2061. The Supreme Court noted that "direct purchasers sometimes may refrain from bringing a trebledamage suit for fear of disrupting relations with their suppliers," *id.* at 746, 97 S.Ct. at 2075, but concluded that on balance this risk of non-enforcement does not warrant it to reconsider its conclusion that indirect purchasers are to be barred from suing. Given the fact that the Supreme Court evidently reached its decision without considering the possibility that purchasers from competitors could fill this gap in enforcement, we see no reason to expand upon the Supreme Court's assessment of the issue by suggesting, as does the dissent, that granting standing to purchasers from competitors "is one way of preventing that risk of non-enforcement from becoming a reality." *Infra* at p. 596. For, as we now know, on the basis of studies conducted in the wake of *Illinois Brick*, this fear of non-enforcement is not supported by the evidence; direct purchasers do indeed sue their suppliers under the antitrust laws and are "the backbone of private antitrust enforcement." *See* Handler, *Antitrust —1978*, 78 Colum.L.Rev. 1363, 1425–26 (1978). And although we agree with the dissent that enforcement efforts might be enhanced by granting purchasers from competitors standing to sue, as indeed would be the result whenever any plaintiff is granted standing to sue, we conclude that this benefit is outweighed by the countervailing factors discussed in the text.

**49.** We recognize that on rare occasions it may be unnecessary to engage in such economic analyses because the particular competitor of the defendants that supplied the plaintiff would be able and willing to testify that it raised its prices by a specific amount as a result of the wrongdoers' pricing decisions. Nevertheless, inasmuch as we are fashioning a rule of stand-

*Brick*, it would be anomalous to permit purchasers from competitors of defendants—who may not have been harmed at all—to sue for the competitors' profits, when indirect purchasers, who always absorb part of defendants' overcharge,[50] may not sue the defendants.

Moreover, to permit a purchaser from a competitor of the defendants to sue for treble damages would appear to be incompatible with the antitrust goal of maintaining a competitive economy. Allowing recovery for injuries whose causal link to defendants' activities is as tenuous as it is here could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally-earned profits, because under the theory propounded by Murray, price fixers would be held accountable for higher prices that arguably ensued in the entire industry.[51] Notwithstanding the serious-

ing, we must consider the general situation and not the unusual exception. To do otherwise would be to make determinations regarding standing to sue contingent upon what evidence a plaintiff has mustered at the time the court rules on the standing issue. In addition, given the other factors discussed in the text, we cannot say that were these problems of proof not present, a purchaser from a competitor would have standing to sue for treble damages.

The dissent apparently concedes that complex economic analyses usually would be required in treble damage suits brought by purchasers from competitors of the defendants, but maintains that there is little reason to believe that proof of damages would be significantly more complex or speculative than in actions by direct purchasers. Both with respect to the defendants and with respect to their competitors, the dissent points out, the price actually charged is known or easily ascertainable, and the only difficulty is in determining the price that would have been charged had the anticompetitive conduct not occurred. *Infra* at p. 599. What the dissent seems to overlook, however, is the purpose for which the admittedly speculative economic data is to be used in each situation. The direct purchasers have clearly been harmed by the price-fixing conspiracy in that they have absorbed at least a portion of the illegal overcharge, and would introduce the economic data merely to establish the amount of the illegal overcharge. As we know, an antitrust plaintiff is not held to the same standard of proof as are plaintiffs in other types of actions, and the factfinder is allowed to make a reasonable estimate of the amount of damages suffered. *See* note 43 *supra*. In contrast, a purchaser from a competitor, in addition to proving the amount of damages suffered, ordinarily must also establish the very fact that it was injured, which fact it must prove with "reasonable certainty." *See id*. It therefore appears that a different sort of economic analysis is called for in each situation: whereas to establish the amount of damages, the factfinder simply has to settle on some approximation of the price that would have been charged by the defendants and their competitors in a competitive market, to establish the fact of injury, or causation, the factfinder must ascribe specific reasons to a competitor's

pricing decisions and determine that such decisions would not have been made had one of a number of variables been slightly different. As discussed in the text accompanying notes 44–45 *supra*, this task is difficult to perform, and indeed may be impossible.

**50.** Only under an economist's hypothetical model either of perfect elasticity of demand or of a direct purchaser that does not wish to maximize profits would no portion of the overcharge be absorbed by the indirect purchasers. *See* Schaefer, *supra* note 9, at 887–97, 901–06.

**51.** The dissent attempts to minimize the potentially ruinous effect of such open-ended liability by suggesting that

[O]nly businesses with a substantial share of a market are likely, by fixing prices, to significantly affect the prices charged by competing businesses. Thus, it can reasonably be assumed that there will only be large recoveries against large companies or a large group of smaller companies who are best able to withstand such losses. . . . Thus, the operation of the market would tend to prevent recoveries in suits such as this from being of a ruinous or anticompetitive dimension.

*Infra* at p. 598. We are not persuaded by this statement. Although we agree with the premise—that "only businesses with a substantial share of a market are likely, by fixing prices, to significantly affect the prices charged by competing businesses," *see generally*, L. Sullivan, Antitrust §§ 61, 115–17 (1977)—we do not believe that the conclusion—that large recoveries will be borne by those companies "who are best able to withstand such losses"—follows from it. Noncompetitive pricing patterns can prevail under a variety of market conditions, *see generally*, Hay & Kelley, *An Empirical Survey of Price Fixing Conspiracies*, 17 J. Law & Econ. 12 (1974), and a firm may become an industry price leader with a remarkable small "substantial" share of the market, simply because it has a larger share than any other company and is perceived for one reason or another to be the industry pace-setter. Given this fact, merely because a company has become an industry price leader, whether ad-

ness of the *per se* violation present in this case, the judiciary should not be hasty to allow the treble damage action to become so destructive a force, when Congress intended only that it be used as a weapon to enforce the antitrust laws. In this regard, it should be noted that Congress has enacted relatively stiff criminal penalties to punish those who flout the antitrust laws,[52] that the Supreme Court has been especially reticent in sanctioning multiple treble damage recoveries for the same injury,[53] and that other courts have been wary of permitting "overkill" recoveries,[54] whose punitive impact may unduly cripple a defendant and lead to an overall deleterious effect upon competition.

■ For these reasons, we conclude that Murray, in its role as a purchaser of consumer bags from competitors of the defendants, has no standing to sue the defendants for treble damages allegedly resulting from such purchases. We recognize that an alternative approach to erecting a standing barrier would be to give an opportunity to purchasers from competitors of price fixers, who allege that they were harmed in some way by the antitrust violation, to attempt to prove such harm and to recover treble damages if they succeed. Implicit in the doctrine of standing, however, is the recognition that the benefits that would flow from such an alternative are outweighed by its practical consequences. Thus, the § 4 standing doctrine "acknowledges that while many remotely situated persons may suffer damage in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of [someone] who is an immediate victim of the violation," and that "if the flood-gates were opened to permit treble damage suits . . . , the lure of a treble recovery . . . would result in

an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress."[55] These countervailing factors, which have prompted courts to close their doors to all but those "whose protection is the fundamental purpose of the antitrust laws," were emphasized by the Supreme Court—though in a slightly different context—in *Illinois Brick*, and we are not free to ignore the thrust of its decision.

### C. *Mid-West Paper Company*

With respect to Mid-West, the district court order granted summary judgment on the ground that Mid-West "did not purchase consumer bags directly from the defendants . . . . *See Illinois Brick Co. v. State of Illinois*, 731 U.S. 720 [97 S.Ct. 2061, 52 L.Ed.2d 707] (1977)." On appeal, defendants urge that this order be upheld for two reasons.

First, they maintain that the bags purchased by Mid-West from Great Plains, a subsidiary of one of the defendants, and resold by Mid-West for packaging automobile and machine parts, are not consumer bags. In support of this position, defendants submit that Great Plains does not manufacture consumer bags, and that Mid-West's purchase orders from Great Plains demonstrate such fact in that they describe the bags that were ordered either as kraft or as plain paper bags. Defendants also argue that because Mid-West admits that it is relying on the government indictment, it is bound by that indictment as well as by the government's bill of particulars that elaborates upon the indictment. And, defendants point out, neither of these documents mention the packaging of machine

---

vertently or inadvertently, it does not mean that it can withstand the burdens of a treble damage recovery that is based upon profits obtained by the rest of the industry.

**52.** *See* 15 U.S.C. § 1 (1976).

**53.** *See e. g., Illinois Brick, supra,* 431 U.S. at 730–31, 97 S.Ct. 2061; *Hawaii v. Standard Oil Co., supra,* 405 U.S. at 262–64, 92 S.Ct. 885.

**54.** *See, e. g. Cromar, supra,* 543 F.2d at 506; *Jeffrey v. Southwestern Bell, supra,* 518 F.2d at 1131; *Calderone Enterprises Corp., supra,* 454 F.2d at 1295.

**55.** *Calderone Enterprises, supra,* 454 F.2d at 1295.

parts as a use of consumer bags.[56] Defendants further contend that Mid-West has not controverted their affidavits attesting that the bags in question are not consumer bags, but instead has rested on the unsupported allegations of its complaint. Accordingly, they assert, Mid-West has not shown that a dispute exists concerning a material fact so as to preclude summary judgment.

■ Whether the bags purchased by Mid-West are consumer bags is of course a question of fact. But the district judge's order does not indicate whether his grant of summary judgment was based upon a determination that the bags were not consumer bags. Indeed, particularly when the portion of the order addressing Mid-West's claim is compared with other portions of the order, the inference is that the judge dismissed Mid-West's claim on a legal rather than on a factual ground.[57] In such circumstances, we have no alternative but to remand the case so that the district court may make a finding as to the nature of the bags in question. We do not deem the fact that Great Plains is a subsidiary of Continental Group and describes its product as a kraft or paper bag to be determinative of the issue. Obviously, a manufacturer may not insulate its activities from scrutiny by compartmentalizing its corporate organization and then giving different names to its product, depending on the division that fabricates it. Nor do we regard Mid-West as being bound by the government's framing of its criminal case in its bill of particulars. Rather, so long as Mid-West is prepared to prove its charges, independent factual determinations must be made whether the bags bought by Mid-West bear the same characteristics as the bags described in the government indictment[58] and whether a price-fixing conspiracy existed with respect to the marketing of such bags.[59] Finally, inasmuch as samples of the bags were presented for *in camera* inspection by the district court, it cannot be said that Mid-West rested on the allegations in its complaint and pleadings and did not controvert defendants' affidavits.

Defendants' second line of argument is that even conceding that the bags bought by Mid-West are consumer bags, as a matter of law Mid-West may not sue for treble damages because it did not purchase the bags directly from any of the defendants. To the extent that Mid-West bases its claim upon purchases from competitors of the defendants, we agree that Mid-West has no standing to sue, for the reasons elaborated

---

56. Paragraph 6 of the government indictment states:

> Consumer bags are used for packaging a variety of products including, among others, pet foods, cookies, tea, coffee, kitty litter, chemicals, and agricultural products. Consumer bags also include air sickness bags. In response to the defendant's request in the criminal suit for a more specific definition of the term "consumer bags," the government filed a "Voluntary Bill of Particulars" that relied upon the defendants' price lists to identify the bags. None of the price lists mention the packaging of automobile or machine parts as one of the uses for the product being offered for sale.

57. The order treats Mid-West's claim together with the claims of the supermarket plaintiffs that are grouped in the first category, which clearly were dismissed on the legal ground that such plaintiffs were indirect purchasers. In contrast, in dismissing the claim of another plaintiff, Sambo's Restaurants, Inc., the next paragraph of the order states that the dismissal is based "on the ground that the paper bag [Sambo's] purchases is not a 'consumer bag.'"

58. We note in this regard that paragraph 6 of the indictment did not purport to give an exhaustive list of uses for consumer bags, which are described in paragraph 5 in the following manner:

> Consumer bags, also known in the trade as "small bags," are made from one or more plies of paper and may be combined with other materials used as linings and/or coatings. Consumer bags are preformed by the manufacturer in many styles and sizes according to customer specifications. Most consumer bags have printed exterior designs as specified by the customer. Consumer bags are designed for capacities of less than twenty-five pounds. They are normally used to pre-package products which are then marketed in such bags.

59. We do not at this time address the question whether and in what circumstances a successful government prosecution would obviate the necessity for Mid-West to prove a price-fixing conspiracy. *See* 15 U.S.C. § 16.

upon in our discussion of Murray's cause of action. But Mid-West also purchased bags from a subsidiary of one of the defendants, and the possibility therefore exists that it may be entitled to sue defendants for injuries that resulted from these purchases.

Superficially, Mid-West's situation seems analogous to that of the plaintiff in *In re Sugar Industry Antitrust Litigation (Stotter v. Amstar)*, 579 F.2d 13 (3d Cir. 1978). In that case, the plaintiff, which was seeking treble damages from refiners of sugar that had engaged in a conspiracy to fix prices, purchased from a subsidiary of one of the defendants candy that incorporated such sugar. Mid-West maintains that it, too, may benefit from our conclusion in *Stotter* that "at least for this purpose and this context, the subsidiary should be treated as the alter ego of the parent." [60] However, a closer look at the problem presented in *Stotter* makes it apparent that no such inference may be made with respect to this case. For in *Stotter* we recognized that when a manufacturer sells its product to a subsidiary before making it available to the public, to bar the purchaser from the subsidiary from suing on the authority of *Illinois Brick* "would invite evasion [of the antitrust laws] by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser." [61] In contrast, the manufacturer-price fixer in the present case would not be insulated from suit under the *Illinois Brick* rule, because Mid-West is a direct purchaser from Great Plains and may sue it if it participated in this or any other price-fixing conspiracy. Accordingly, the rationale that underlay our willingness to disregard the separate legal existence of the subsidiary in *Stotter* is not applicable here.

Nevertheless, under certain other circumstances, a court will regard a parent and subsidiary as one entity. This is so, for example, when the parent dominates and controls the subsidiary to such an extent that the subsidiary is deemed to be an agent of the parent. [62] If Mid-West can establish facts that warrant holding Continental Group legally accountable for Great Plains' activities in that as a consequence of Continental's domination the subsidiary's prices were determined in accordance with the general price-fixing conspiracy, Mid-West would be entitled to sue defendants for damages resulting from its purchases from Great Plains.

In sum, then, Mid-West's case must be remanded to the district court for further proceedings to determine whether the bags purchased by Mid-West are consumer bags and whether Continental is to be held accountable for Great Plains' alleged participation in the conspiracy.

## IV. INJUNCTIVE RELIEF

Aside from seeking treble damages, the various plaintiffs requested the district court to enjoin the defendants from continuing to conspire to fix prices. This request was based on section 16 of the Clayton Act, 15 U.S.C. § 26, which states in part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . . .

The district court granted summary judgment in favor of the defendants, thus implicitly holding that injunctive relief was not available to the plaintiffs. Two lines of argument are now set forth by defendants

---

**60.** 579 F.2d at 18–19.

**61.** *Id.* at 19.

**62.** *See, e. g., P. F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 266–67 (6 Cir.), *cert. denied,* 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 186 (1970). *See generally,* W. M. Fletcher, Cyclopedia of the Law of Private Corporations § 277 (rev. ed. 1969).

to support this result with respect to the supermarket plaintiffs.[63]

Defendants place primary reliance upon *Illinois Brick*. They interpret that case as defining who sustains judicially cognizable injury under the antitrust laws, and contend that if an indirect purchaser is considered not to have suffered actual injury for purposes of § 4, it also must be deemed not to be "threatened" with injury under § 16. Also, defendants assert that the requirement, found in both § 4 and § 16, that the injury or damage be proximately caused by the antitrust violation[64] is identical in each section, and that consequently *Illinois Brick's* ostensible holding that any injury sustained by indirect purchasers is not proximately caused by the antitrust violation, is equally relevant with respect to injunctive relief. Essentially, then, defendants maintain that in light of *Illinois Brick* the supermarket plaintiffs lack standing to seek injunctive relief.

For a secondary argument, defendants submit that the supermarket plaintiffs have not demonstrated the irreparable injury that defendants claim is necessary to sustain a grant of injunctive relief. In that a consumer bag is a relatively miniscule element of the product purchased by the supermarkets, defendants maintain that any damage to the supermarkets is too minute

to warrant injunctive relief. Furthermore, they argue that the supermarkets will be adequately protected by the injunctive relief already being sought, though apparently not yet obtained, by direct purchasers and by the government.

As in our treatment of standing to sue for treble damages under § 4, we look to the policies underlying § 16 to determine whether a party has standing to sue for injunctive relief. A private action for relief under § 16 is one of the weapons, together with private treble damage actions and government criminal and civil suits, in the arsenal established by Congress for policing the antitrust laws[65] and for vindicating "the important public interest in free competition."[66] In addition, § 16 shares with § 4 the objective of providing private relief from anticompetitive conduct that is injurious, or that threatens to be injurious, to a plaintiff.[67] But in contrast to the treble damage action, a claim for injunctive relief does not present the countervailing considerations—such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses—that the Supreme Court emphasized when limiting the availability of treble damages.[68]

The difference between the two sections is reflected in their language as well as in

---

63. Apparently, both the defendants and Mid-West are of the belief that Mid-West's entitlement to injunctive relief is completely dependent upon whether Mid-West may sue for treble damages. That assumption overlooks the possibility that Mid-West may be found to have purchased consumer bags but that it may not sue defendants for treble damages because Continental Group is not legally accountable for its subsidiary's sales. In that event the issue would arise whether Mid-West, as a direct purchaser of consumer bags from competitors of the defendants, has standing to sue for injunctive relief. Inasmuch as neither side briefed that issue and since it is presently premature for decision, we merely note its existence. A parallel issue exists with respect to Murray, but we need not decide it either, since we conclude that Murray has standing to sue for injunctive relief in its capacity as an indirect purchaser, and "100 injunctions are no more effective than one." *Hawaii v. Standard Oil Co., supra*, 405 U.S. at 261, 92 S.Ct. at 891.

64. *See Reibert v. Atlantic Richfield Co.*, 471 F.2d 723, 731 (10 Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) ("The aggrieved party must satisfy the 'by reason of' and/or 'by' requirements found in sections 4 and 16 of the Clayton Act, respectively. This prerequisite boils down to complainant proving that the antitrust violations are the proximate cause of his injury.")

65. *See Zenith Radio Corp., supra*, 395 U.S. at 130–31, 89 S.Ct. 1562; *United States v. Borden Co.*, 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954).

66. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

67. *See Zenith Radio Corp., supra*, 395 U.S. at 130–31, 89 S.Ct. 1562.

68. *See In re Multidistrict Vehicle Air Pollution M. D. L. No. 31, supra*, 481 F.2d at 130.

their judicial construction. Thus, with respect to § 4, a body of law has developed that defines when a person is "injured . . 'by reason of anything forbidden in the antitrust laws,'"[69] and *Illinois Brick* is the latest major refinement of that definition. Similarly, other cases have expounded upon the requirement that the injury be to the "business or property" of the plaintiff.[70] And as already seen above, a complicated doctrine of standing, unique to § 4, has been applied to limit the availability of treble damage actions to those parties who further the policy goals of such remedy.

In contradistinction to § 4, § 16 does not ground injunctive relief upon a showing that "injury" has been already sustained, but instead makes it available "against *threatened loss or damage.*" Furthermore, § 16 does not state that the threat must be to the plaintiff's "business or property,"

and courts accordingly have held that non-commercial interests are also protected.[71] Most significantly, however, § 16 by its terms entitles a party to injunctive relief "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." Mindful of these distinctions, courts have held that for purposes of § 16 the complainant "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur,"[72] and that a person may have standing to obtain injunctive relief even when he is denied standing to sue for treble damages.[73] Indeed, the test for standing under § 16 has been framed in terms of a proximate cause standard that is "less constrained" than that under § 4[74] and which

**69.** *See, e. g., Brunswick Corp., supra; Hanover Shoe, supra; GAF Corp. v. Circle Floor Co.,* 463 F.2d 752, 757–59 (2d Cir. 1972), *cert. denied,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

**70.** *See, e. g., Hawaii v. Standard Oil Co., supra; Reiter v. Sonotone Corp.,* 579 F.2d 1077 (8th Cir. 1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 830, 59 L.Ed.2d 30 (January 9, 1979); *Reibert, supra; Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers v. United Contractors Ass'n,* 483 F.2d 384 (3d Cir. 1973), *modified,* 494 F.2d 1353 (1974).

**71.** *See, e. g., Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31, supra,* 481 F.2d at 130–31. *See also Hawaii v. Standard Oil Co., supra,* 405 U.S. at 259–62, 92 S.Ct. 885.

**72.** [F]or § 16 of the Clayton Act, 15 U.S.C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened" injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury, *see Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn.,* 274 U.S. 37, 54–55, 47 S.Ct. 522, 527, 71 L.Ed. 916 (1927); he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. *See Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Bedford Cut Stone Co. v.*

*Journeymen Stone Cutters' Assn., supra,* 274 U.S. at 54, 47 S.Ct. at 527; *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952); *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *Zenith Radio Corp., supra,* 395 U.S. at 130, 89 S.Ct. at 1580 (footnote omitted).

**73.** *See, e. g., id.* at 125–33, 89 S.Ct. 1562; *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31, supra,* 481 F.2d at 125–31. *See also Bogus v. American Speech & Hearing Ass'n,* 582 F.2d 277 (3d Cir. 1978), where we noted that § 16 imposes a lower threshold standing requirement than § 4 of the Clayton Act. L. Sullivan, [Antitrust (1970)] *supra* at 772. Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4, *see Hawaii v. Standard Oil Co.,* 405 U.S. 251, 260–61, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy, *see id.* at 261–62, 92 S.Ct. 885; *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 131, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). A party with standing under § 4 ordinarily will have standing under § 16. *Tugboat, Inc. v. Mobil Towing Co.,* 534 F.2d 1172, 1174 (5th Cir. 1976); P. Areeda & D. Turner, *supra,* § 335e. *Id.* at 288–89.

**74.** *Jeffrey v. Southwestern Bell, supra,* 518 F.2d at 1132 ("[C]ourts take a less constrained view of standing in suits involving injunctive relief than in those demanding treble damages. . . . To achieve standing under § 16 the petitioner must demonstrate that he is threatened with

might in fact be no more rigorous than the general rule of standing.[75]

We begin our examination whether, for purposes of injunctive relief, the defendants' price-fixing conspiracy may have been the proximate cause of any damage or loss incurred by the indirect purchasers,[76] by observing that *Illinois Brick* does not control this inquiry. That case, which was explicitly decided on grounds other than standing[77] and in any event never mentions § 16, was determined earlier[78] to be relevant to the question whether a direct purchaser from a competitor of the defendants has standing to sue for treble damages. This conclusion was reached, however, only because similar policy considerations underlie the respective issues of standing to sue for treble damages and the use of pass-on theories in treble damage actions.

But no such common basis exists between the use of the pass-on theory in treble-damage actions and standing to obtain injunctive relief. The concerns that motivated the Supreme Court to bar offensive use of pass-on centered on problems created by the treble damage recovery. Obviously, the risk of exposure to multiple liability, the difficulty in tracing the allocation of the overcharge among different levels of purchasers, and the general desirability of symmetrical application of the pass-on theory to plaintiffs and defendants are wholly unrelated to the issue whether a party should be entitled to sue for injunctive relief. Nor does the position taken in *Illinois Brick*, that effective enforcement of the antitrust laws requires that only direct purchasers be permitted to sue for treble damages, have validity in the context of § 16. The Court in *Illinois Brick* concluded that the effectiveness of the treble damage action would be impaired by allocating the recovery among all those who paid the illegal overcharge rather than by concentrating the recovery in the hands of the direct purchasers for in that event no one group would have a sufficient incentive to sue.[79] With respect to injunctive relief, however, the entitlement of one group to sue does not diminish the incentive of another group to sue. In fact, enforcement of the antitrust laws is augmented by allowing any individual threatened by the anticompetitive activity to challenge it. In view of the markedly different policies upon which § 4 and § 16 are based, then, we cannot subscribe to defendants' broad assertion that *Illinois Brick* defined injury and proximate causation for purposes of both sections.

It should be noted that the element of causation is not at issue in resolving the question whether indirect purchasers have standing to obtain injunctive relief. As recognized by *Illinois Brick*, "in elevating

loss or injury proximately resulting from the antitrust violation.").

**75.** *See, e. g., Tugboat, Inc. v. Mobil Towing Co.,* 534 F.2d 1172, 1174 (5th Cir. 1976) (footnotes omitted):

It is apparent from the language of § 16 that the applicable standing rules in suits to enjoin antitrust violations are the general rules of standing. The plaintiff need show only that he is threatened by injury proximately caused by the defendant.

**76.** The question whether the damage sustained by indirect purchasers has been proximately caused by the antitrust violators for purposes of standing to sue for treble damages has, of course, been mooted by *Illinois Brick's* holding that as a matter of law indirect purchasers may not sue for treble damages. Prior to *Illinois Brick* there existed a split among the various courts of appeals on this issue. *Compare, e. g., Donson Stores, Inc. v. American Bakeries Co.,* 58 F.R.D. 481, 483–85 (S.D.N.Y.1973) *and Phil-*

*adelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 50 F.R.D. 13, 30 (E.D.Pa.1970), *aff'd per curiam sub nom. Mangano v. American Radiator & Standard Sanitary Corp.,* 438 F.2d 1187 (3d Cir. 1971), *with Illinois v. Ampress Brick Co.,* 536 F.2d 1163, 1166–67 (7 Cir. 1976), *rev'd sub nom. Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) *and In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973), *cert. denied, Standard Oil Co. of Cal. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974). Needless to say, in view of the different policy considerations reflected in § 4 and § 16 concepts of standing, these cases are not controlling here.

**77.** 431 U.S. at 728 n.7, 97 S.Ct. 2061.

**78.** *See* Part IIIB *supra.*

**79.** *See* 431 U.S. at 745–46, 97 S.Ct. 2061.

direct purchasers to a preferred position as private attorneys general, the *Hanover Shoe* rule denies recovery to those indirect purchasers who may have been actually injured by antitrust violations." [80] Rather, the question is whether the line for proximate causation should be drawn at the same place as it was drawn for purposes of treble damage actions or not.

We have already seen that the reasons for adopting a constricted position with respect to proximate causation in the context of treble damage actions are inapposite in the context of injunctive relief and that at least one court has stated that a party may sue under § 16 so long as it satisfies the standing requirements generally applicable in the federal courts. We need not, however, measure the outer range of standing to sue under § 16 in order to decide this appeal. For unlike other potential plaintiffs, who may be only remotely affected by the ripples caused by the conspirators' tampering with the supply and demand curve, indirect purchasers can state unequivocally that under all circumstances prevalent in the real economic world,[81] money is passing from their hands into the pockets of the price fixers as a result of the conspiracy, and that no rational pricing decisions by any intermediary will erase this fact.[82]

Moreover, the rule of standing urged by the defendants, which would completely bar indirect purchasers from seeking injunctive relief, would leave a serious gap in the antitrust enforcement scheme, as the fate of these injured parties, and of the competitive economy in an entire industry, would be made dependent upon the willingness of the government and the direct purchasers to assume the burdens of a lengthy lawsuit. Such a result would be inconsistent with the policies of assuring vigorous enforcement of the antitrust laws, preserving competition, and providing relief for those injured by anticompetitive conduct. Yet in contrast to treble damage suits, it would appear that no countervailing interests would be served [83] by placing all indirect purchasers

**80.** *Id.* at 746, 97 S.Ct. at 2075.

**81.** As mentioned earlier, only in a hypothetical economic model would no portion of the illegal overcharge be absorbed by the indirect purchaser, and then only if the indirect purchaser's demand for the product was perfectly elastic or if the middleman did not wish to maximize its profits and therefore absorbed the entire overcharge on its own. See note 50 *supra.*

**82.** In this critical respect, the indirect purchaser is to be distinguished from those parties that have been denied standing to sue for injunctive relief by other courts. *E. g., Jeffrey v. Southwestern Bell, supra;* (residential telephone subscribers have no standing to seek to enjoin higher rates allegedly sought from, and approved by, public utility commission to recoup losses from illegal predatory pricing of telephone equipment); *Nassau County Ass'n of Insurance Agents, Inc. v. Aetna Life & Casualty Co.,* 497 F.2d 1151 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974) (unincorporated insurance associations have no standing under § 16 to prevent insurance companies from terminating contracts of insurance agents that are members of plaintiff associations, where only loss alleged is decrease in membership and dues); *Conference of Studio Unions v. Loew's Inc., supra;* (unions, association of unions, and individual members may not sue major motion picture companies for allegedly destroying independent companies and thereby causing loss of wages to members, dues to association, and expenditures by unions to secure new employment for members). The district court in *Parkview Markets, Inc. v. Kroger Co.,* 1978 CCH Trade Cases ¶ 62,373 (S.D.Ohio 1978) relied on these factually dissimilar cases to deny standing under § 16 to an indirect purchaser.

**83.** True, as the defendants' argument suggests, once the antitrust violation is being actively contested by other parties, the interest of the judicial system in economizing its own efforts comes into play. Similarly, if a defendant is already enjoined from engaging in the illegal activities, it would be wasteful to require it to defend another suit seeking to enjoin the same activities once again, particularly since attorneys fees may now be awarded to successful plaintiffs under § 16. See 15 U.S.C.A. § 26 (1978 Supp.). In our view, however, these considerations do not bear upon the problem of determining proximate causation for purposes of § 16. The "private and public actions were designed to be cumulative, not mutually exclusive. . . . They may proceed simultaneously or in disregard of each other." *United States v. Borden, supra,* 347 U.S. at 518–19, 74 S.Ct. at 706. And it would be odd if Congress' recent authorization of attorneys fees under § 16, which was intended to enhance the effectiveness of private injunctive suits, *see* H.Rep. No.94–499, 94th Cong. 2d Sess. 18–20 (1975),

in a straightjacket, so to speak, and preventing them from taking any legal action to protect themselves from injury, inasmuch as the equity principles that are to be considered under § 16 can effectively screen out those claimants that are undeserving of injunctive relief.

In determining that indirect purchasers have standing to sue for injunctive relief under § 16 but that each plaintiff must establish its entitlement to such equitable relief, we have endeavored to chart an approach that preserves the flexibility of that provision by making the relief it affords available when necessary to further antitrust policies, yet inaccessible to those who should not benefit from injunctive relief. Because when dealing with the Sherman Act we are expounding one of the fundamental laws governing the American economic system and because Congress has not evinced an intent that its goal of free competition be treated in an niggardly fashion by the judiciary, such flexibility appears salutary. Indeed, we believe these efforts to steer a middle ground in interpreting § 16 are in keeping with the Supreme Court's own attitude regarding the provision:

> Section 16 should be construed and applied with this purpose [of enforcing the

antitrust laws] in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). Its availability should be "conditioned by the necessities of the public interest which Congress has sought to protect." *Id.*, at 330, 64 S.Ct., at 592.[84]

We conclude therefore that for purposes of § 16, the damages—if any—sustained by the supermarket plaintiffs, as indirect purchasers, are proximately caused by the price-fixers' violations. But although we hold that *Illinois Brick* does not preclude indirect purchasers from suing for injunctive relief and that they have standing to sue under § 16, they still must establish, as the statute requires, that equity principles entitle them to injunctive relief. Because the district court has not yet had occasion to determine whether the supermarket plaintiffs in the present case are entitled to injunctive relief under principles of equity, we shall remand the case for such a determination in the first instance by that court.[85]

U.S.Code Cong. & Admin.News 1976, p. 2572, resulted in a circumscription of the parties eligible to sue. Instead, it would appear that these concerns are properly to be considered by the court when it exercises its equity powers to decide whether an injunction is appropriate under the circumstances.

**84.** *Zenith Radio Corp., supra*, 395 U.S. at 131, 89 S.Ct. 1562.

**85.** We disagree with the defendants' argument that a remand is unnecessary because, they claim, it is evident that the plaintiffs are not entitled to injunctive relief. First, contrary to defendants' assertions that plaintiffs must prove irreparable injury, the proper standard is that articulated in *Zenith Radio Corp., supra.* Second, we do not regard the plaintiffs to be necessarily foreclosed from injunctive relief by the mere pendency of the government and direct purchaser suits for similar remedies. Generally, "[t]hey may proceed simultaneously or in disregard of each other," *United States v. Borden Co., supra*, 347 U.S. at 519, 74 S.Ct. at 706, and should be permitted to do so if, con-

sidering all the circumstances (including the present status of the government and direct purchaser suits), the plaintiffs are still able to establish a "significant threat of injury" under general equity principles. In this regard we note, however, that the district court may wish to consider whether any meaningful difference exists in the present case "with respect to the parties capable of enforcing" the injunction, or whether the reality here is that "one injunction is as effective as 100, and concomitantly, that 100 injunctions are no more effective than one. . . ." *See Hawaii v. Standard Oil Co., supra*, 405 U.S. at 261, 92 S.Ct. 885, 891. Also, in view of the fact that the natural litmus test for determining whether a party is sufficiently injured to obtain injunctive relief—whether it was willing to bear the burden of litigation—has been swept away by the recent congressional award of attorneys fees under § 16, and in view of the consequent potential for unnecessary litigation costs to defendants, the district court may wish to consider the feasibility of consolidating the various suits for injunctive relief.

## V.

The judgment of the district court with respect to the supermarket plaintiffs will be affirmed insofar as it denies them treble damages, but reversed and remanded insofar as it precludes them from obtaining injunctive relief. With respect to Mid-West Paper Products Company, the judgment will be vacated and the case remanded for further proceedings consistent with this opinion.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part.

The majority would deny standing to Murray's of Baederwood and Mid-West Paper Products Co. insofar as they seek to sue defendants for allegedly excessive prices paid to defendants' competitors as a result of defendants' price-fixing. The question of how to properly limit antitrust standing has been a troubling one for courts and commentators alike. Although it has been suggested that the issue is really not one of "standing" at all,[1] the appellation is appropriate at least in that the question has produced an amount of confusion and uncertainty in the law commensurate with that produced by traditional standing questions. It is generally conceded that the decisions on antitrust standing are, in the words of one commentator, "discordant, with inconsistent rationales and no common premise."[2] This court has wisely chosen not to rely on any one test or formula to answer the question posed here. I agree with the majority that considerations of compensation for antitrust victims and deterrence of antitrust violators must be central to our analysis.[3] I agree also that we must not lose sight of the ultimate purpose of the antitrust laws—preserving competi-

tion. I disagree, however, that denying standing to those who suffer injury as a result of their purchases from competitors of price-fixers will best serve these related goals of just compensation, vigorous enforcement and free competition. Therefore, I respectfully dissent as to this issue. In all other respects I join in the majority opinion. Although few courts or commentators have analyzed this exact problem, those that I have found who have addressed the issue have agreed that recovery of this sort should be permitted. *See State of Washington v. American Pipe and Construction Co.*, 280 F.Supp. 802 (W.D.Wash. 1968); Berger and Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 879 (1977); Note, 82 Harv.L.Rev. 1374 (1969).

Since the determination of whether Murray's and Mid-West have standing must be arrived at pursuant to a balancing of factors, I will first discuss those factors that I believe weigh in favor of granting standing here and then analyze why I believe the factors potentially tilting the balance the other way are either not present or are outweighed. The first factor to be considered is that the injuries alleged here will go uncompensated if standing is denied. In other words, there is allegedly injury in fact. Also any recovery obtained would not be duplicative of any other recovery which might be obtained. Actual injury, of course, is only the starting place for standing analysis. It must not be forgotten, however, that the primary purpose of antitrust damage remedies is remedial rather than punitive. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485–86, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Therefore,

---

1. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 447 n. 6 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

2. Handler, *The Shift From Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review*, 71 Colum.L.Rev. 1, 24 (1971). The variety of approaches which the different circuits have taken to this problem was described in *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 127 n. 6–8 (9th Cir.), *cert. denied*,

*Morgan v. Automobile Mfgrs. Assn.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

3. I take mild exception to the majority's description of how antitrust violators are to be deterred: "by depriving them threefold of the 'fruits of their illegality.'" *Supra*, at p. 583. As will be discussed later, not all antitrust remedies are based on a calculation of the defendant's ill-gotten profits.

we must not lightly deny standing where actual injury is alleged.

Allowing standing would also encourage enforcement, and thereby deter violation, of the antitrust laws. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court held that plaintiffs who purchased indirectly from antitrust violators could not sue for their resulting injury.[4] The primary basis for this holding was that allowing multiple suits would dilute the recovery that any one plaintiff could receive and would inject complex issues that would make this diluted recovery more expensive to obtain.[5] Thus the court determined that the antitrust laws would be most effectively enforced if one party, the direct purchaser, were able to sue for the full amount of damages incurred by those in the defendants' chain of distribution.[6] Here, however, there is no question of apportionment. If these plaintiffs cannot sue for these damages, no one can. Also the Court recognized that, once recovery was concentrated in the hands of the direct purchaser, there is a risk that those purchasers will be unwilling to sue because they can avoid actual injury to

themselves by passing on the added costs to their purchasers and, by suing, they will endanger their source of supply. 431 U.S. at 746, 97 S.Ct. 2061. Allowing recovery here is one way of preventing that risk of non-enforcement from becoming a reality. A plaintiff might well sue the competitor of his supplier where he would not risk suing his own supplier. Thus this situation is much different from that in *Illinois Brick* since allowing recovery here would not reduce the incentive for private parties to enforce the antitrust laws, and, moreover, would serve to encourage enforcement in situations where such enforcement is especially needed.

In deciding whether to allow standing in antitrust cases, courts have attempted to analyze the directness of the injury to the plaintiff. In its most restrictive form, this is essentially a privity test.[7] Such a narrow conception of directness has been generally rejected.[8] Instead, courts have utilized a proximate causation analysis. Indeed, on at least two occasions, this court has described the standing issue as one of proximate causation.[9] Although "proximate cause" is not much more definite in its meaning than

4. As the majority recognizes, *Illinois Brick* was not, itself, a standing case. I agree with the majority, however, that the reasoning utilized in that opinion has implications for standing analysis.

5. The Court, in *Illinois Brick,* stated:

[W]e understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

431 U.S. at 734–35, 97 S.Ct. at 2069.

6. I believe the majority is seriously mistaken when it states:

*Illinois Brick* represents in effect the proposition that when defendants have fixed prices above the competitive market price, where the benefit derived by them is readily ascertainable, the objectives of the treble damage action are fulfilled when the defendants are required to pay the direct purchasers three times the overcharge.

*Supra,* at p. 585 (footnote omitted). Neither the language nor logic of *Illinois Brick* justifies the conclusion that *only* direct purchasers from

price-fixers can ever recover when prices are fixed at above the market rate. Rather the conclusion is that, among direct and indirect purchasers from the defendant price-fixers, only the direct purchasers can recover and they can recover the entire amount of damages sustained by that whole chain. This limitation is designed to enhance enforcement of the antitrust laws. *See* n. 5, *supra.* As is discussed in the text accompanying this note, denying standing here would not further that end.

7. *See, e. g., City and County of Denver v. American Oil Co.,* 53 F.R.D. 620, 631 (D.Colo. 1971).

8. *See, e. g., Cromar Co. v. Nuclear Materials and Equipment Corp.,* 543 F.2d 501 (3d Cir. 1976) (rejecting any single test of standing).

9. *See Bogus v. American Speech & Hearing Association,* 582 F.2d 277 at 284 (3d Cir. 1978) ("The doctrine of standing as applied to antitrust cases limits the apparent breadth of this provision by elaborating a concept of proximate causation between defendant's unlawful act and plaintiff's out-of-pocket losses."); *Bogosian v. Gulf Oil Corp.,* 561 F.2d at 447 n. 6.

"direct cause" or "standing" itself, one important indication of whether an injury is proximately caused by an act is whether its occurrence as a result of that act is reasonably foreseeable.[10] The injury here certainly meets this test. It is foreseeable if not inevitable that, when those with a substantial share of the market fix prices, their competitors will also raise prices under the anti-competitive umbrella established by the price-fixers.

Another factor to be considered is "the plaintiff's position in the area of the economy threatened by the alleged anticompetitive acts." *See Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d at 508. This is essentially a phrasing of the "target area" test of standing. Thus, although the "target area" formulation is not the controlling test of antitrust standing in this circuit, it is to be considered in reaching a decision on this issue. As just mentioned, where prices are fixed in an oligopolistic market, the result is likely to be that non-price-fixing competitors will also raise their prices. Murray's and Mid-West as purchasers from these competitors are, therefore, well within the area of economy threatened by defendants' price-fixing activities.[11]

Finally, the seriousness of the violation should also be considered in determining the extent of the violator's liability.[12] In *U. S. v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 2875, 57 L.Ed.2d 854 (1978), the Supreme Court recognized that "the behavior proscribed by the [antitrust laws] is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." The Court noted that some "conduct regarded as *per se* illegal" is not difficult to distinguish from legal business behavior "because of its unquestionably anticompetitive effects." *Id.* The Court cited, on this point, *U. S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), which held that price-fixing agreements are *per se* violations of the Sherman Act. Because it is often difficult to determine exactly what conduct violates the antitrust laws, the Court in *Gypsum* held that a person cannot be subjected to criminal liability for such violations without an inquiry into the intent with which the unlawful actions were taken.

I believe that a similar concern for those who may unwittingly violate the antitrust laws makes it proper for courts to consider this factor in determining to whom the antitrust defendant will be held liable. Thus where businesses engage in practices that might reasonably be considered not to violate the antitrust laws, it would seem proper for courts, as a matter of fairness, to be most cautious in extending the scope of their liability once a violation is found. Where, as here, however, defendants have fixed prices—probably the clearest violation of the antitrust laws and the one most obnoxious to the underlying policy of free competition—considerations of punishment and deterrence warrant the imposition of broad liability.

Among the factors that have led courts to deny standing are the possibility of duplicative, derivative or windfall recovery. Al-

---

10. *See generally*, Prosser, *Law of Torts* (4th ed.) § 43. The majority criticizes "the injection of a foreseeability concept" into the determination of standing, at least with respect to the "target area" test. *Supra*, at p. 581 n. 27. I believe, however, that foreseeability is one of the relevant factors that must be considered as long as directness of injury is one of the criteria of standing. Although the majority cites *Handler, supra* note 2, as criticizing foreseeability analysis in the context of the "target area" test, that article concludes by listing the "reasonable foreseeability of injury" as a "significant element" in determining whether a plaintiff has standing to sue. *Handler* at 30. I believe it is a wise inclusion.

11. One formulation of the target area test requires that the plaintiff not only be in the area, but that he be aimed at. *See, e. g., Calderone Enterprises Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292, 1296 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Plaintiffs admittedly would not have standing under such an analysis. This test, however, has not been adopted by this court, is unduly restrictive and inadequately serves the purposes of compensation and deterrence.

12. *See Handler, supra* note 2 at 30.

lowing standing here, however, would not result in any such recovery. The recovery sought here would not be duplicative since, as mentioned above, no other party could seek damages for part or all of the injury claimed here.[13] The recovery would not be derivative since the parties are not related to some other entity at which the illegal practices are most directly aimed and which could sue in its own right.[14] The recovery could not be properly characterized as "windfall" since the plaintiffs are complaining of actual out-of-pocket losses.

The majority contends that the recoveries even if not duplicative, derivative or windfall, may well be ruinous, i. e., that allowing treble damages to purchasers from competitors of antitrust violators might drive the violators out of business thereby injuring rather than protecting competition. I agree that this is a concern to be taken most seriously. Because undue reliance on this factor might seriously undercut enforcement of the antitrust laws, however, I do not believe that the standing decision should turn on this factor unless there is a very persuasive basis from which to conclude that competition would actually be hurt by the allowance of standing. Otherwise courts might unnecessarily prevent enforcement of the antitrust laws in the guise of protecting competition. I believe further that there is a strong basis on which to believe that competition would *not* be injured by allowing standing in cases such as this. Only businesses with a substantial share of a market are likely, by fixing

prices, to significantly affect the prices charged by competing businesses. Thus, it can reasonably be assumed that there will only be large recoveries against large companies or a large group of smaller companies who are best able to withstand such losses. Where companies with a small market share fix prices, the effect on their competitors would be small and the likelihood of a ruinous damages assessment would be correspondingly minimal. Thus, the operation of the market would tend to prevent recoveries in suits such as this from being of a ruinous or anticompetitive dimension. The majority also indicates that the fact that the defendants did not directly profit from the plaintiffs injuries here is a factor to be considered in denying standing. It is clear from the very nature of the treble damage remedy, however, that recoveries in antitrust cases, as in many other areas of the law, are not intended solely to force the disgorgement of tainted profits.[15] Therefore, I would accord little if any weight to this factor.

Finally, the majority adverts to the complexity of proving damages in this type of case and, closely related to this, the speculative nature of the inquiry into the amount of such damages. Complexity and speculativeness, however, are endemic to antitrust litigation. The length of many antitrust cases is ample indication of their complexity. It is also well established that damages in antitrust action need not be proved with the degree of certainty required in most

---

13. Although the majority expresses some doubt, I believe it is clear that the logic of *Illinois Brick* requires that any recovery by those in the chain of distribution beginning with defendants' competitors be concentrated in the hands of those that purchase directly from the competitors.

14. Creditors, shareholders and officers of corporations injured by antitrust violations have frequently been denied standing because their claims are derivative. *See, e. g., Pitchford v. Pepi,* 531 F.2d 92 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). *See also* Von Kalinowski, 11 *Antitrust Laws and Trade Regulation,* § 81.02[2] and cases cited therein. Lessors have also been denied standing on this basis. *See e. g., Melrose Realty Co. v. Loew's, Inc.,* 234 F.2d 518 (3d Cir.),

*cert. denied,* 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956) (per curiam).

15. For example, in *Pitchford v. Pepi, supra,* this court approved measures of damages from illegal territorial restrictions and the termination of a dealership which looked to the amounts lost by the plaintiff without regard to whether there was a corresponding profit to the defendant. The Supreme Court has recognized that "the treble damage provision [of Section 4 of the Clayton Act] which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 485–86, 97 S.Ct. at 696.

other areas of the law. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

The majority relies on *Illinois Brick*, however, to establish the importance of these factors to our decision today. Although the Court in *Illinois Brick* certainly focussed much of its attention on the added complexity that would result from allowing recovery to indirect purchasers, it is crucial to note the context of that discussion. The Court in *Illinois Brick* was concerned with allowing the injection of complex issues into antitrust actions because the injection of such complexity would increase the cost of litigation and thereby discourage the enforcement of the antitrust laws. Thus the Court states:

> Permitting the use of pass-on theories under § 4 essentially would transform treble-damage actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damage suits and *seriously undermine their effectiveness.*

431 U.S. at 737, 97 S.Ct. at 2070. (emphasis supplied).

As already discussed, allowing suits such as those here will encourage rather than undermine the effective enforcement of the antitrust laws. Where added complexity does not result in a disincentive to the enforcement of the antitrust laws, its potency

as an argument against standing is seriously diminished.

Moreover, there is little reason to believe that proof of damages here will be significantly more complex or speculative than in a suit by a direct purchaser against a price-fixing defendant. In each case, the price actually charged is known. In each case, damages can only be assessed by determining what the market price would have been "but for" the price-fix. Of course in both cases, it is possible that the seller would have sold at a price above that of the market even without the price-fix and presumably the defendant would have an opportunity to present evidence of this. The only discernible difference is that the defendant is likely to have better access to proof regarding its own pricing policies than those of its competitors. This tactical problem of the defendants does not, however, persuade me that standing should be denied here.

Thus I am left with the conclusion that the antitrust policies of compensation and enforcement would be appreciably advanced by allowing recovery for the injuries alleged here. I am unconvinced that such recovery would drive antitrust violators out of the market and thus injure competition. I believe, therefore, that the balance here is properly struck in favor of granting standing to these appellants.[16]

---

**16.** The majority, on four occasions, refers to those " 'whose protection is the fundamental purpose of the antitrust laws.' " I do not believe that the invocation of this phrase advances our analysis here. To the extent that the majority intends this phrase to do more than identify those who are properly allowed standing after consideration of the criteria referred to throughout this opinion, I believe it is pursuing a most misguided course. If Congress' purpose was to protect certain individuals through the treble damage remedy, it is irrelevant that the protection of such individuals was not the "fundamental" purpose of the antitrust laws. Thus we are left with the problem of defining exactly who Congress intended to be able to sue under Section 4. I have already discussed the factors to be considered in making such determinations. The ambiguity of the term "fundamental purpose" makes it ill-suited for service as an additional factor to be analyzed in resolving antitrust standing issues or as a substitute for the factors already discussed. I fear that overemphasizing this term may lead to a narrowing of antitrust standing unsupported by law or logic.