PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3795
_____

**IN RE: PROCESSED EGG PRODUCTS
ANTITRUST LITIGATION**

KRAFT FOODS GLOBAL, INC., KELLOGG COMPANY,
GENERAL MILLS, INC., and NESTLÉ USA, INC.,
Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court Nos. 2-08-md-02002 and 2-12-cv-00088)
District Judge: The Honorable Gene E.K. Pratter
_____

Argued July 11, 2017

Before: SMITH, *Chief Judge*, FUENTES, *Circuit Judge*, and
STARK,[†] *Chief District Judge*

_____

[†] Honorable Leonard P. Stark, Chief Judge of the United States
District Court for the District of Delaware, sitting by
designation.

(Opinion Filed: January 22, 2018)

_____

Richard P. Campbell
James T. Malysiak
Michael T. Brody       **[Argued]**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654

*Counsel for Appellants*

Carrie C. Mahan       **[Argued]**
Weil, Gotshal & Manges LLP
1300 Eye Street, N.W.
Washington, DC  20005

William L. Greene
Ruth S. Shnider
Stinson Leonard Street LLP
150 S. Fifth Street
Minneapolis, MN  55402

Brian E. Robison
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100

Dallas, TX 75201

Christine C. Levin
Jennings F. Durand
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104

Donald M. Barnes
Jay L. Levine
Porter Wright Morris & Arthur LLP
1900 K Street, N.W., Suite 1110
Washington, DC 20006

Molly S. Crabtree
Porter Wright Morris & Arthur LLP
41 South High Street
29th Floor
Columbus, OH 43215

Michael L. Scheier
Joseph M. Callow, Jr.
Keating Muething & Klekamp PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH 45202

Jan P. Levine
Robin P. Sumner
Whitney R. Redding
Pepper Hamilton LLP

3

3000 Two Logan Square
Philadelphia, PA  19103

*Counsel for Appellees*

_____

OPINION

_____


STARK, *Chief District Judge*.

In this antitrust case, suppliers of processed egg products are accused of conspiring to reduce the supply of eggs and, consequently, increasing the market price for egg products.  The District Court, relying on our decision in *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979), as well as the bar on indirect purchaser actions established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), concluded that the purchaser-plaintiffs lack antitrust standing.  We find that neither *Mid-West Paper* nor *Illinois Brick* bars the price-fixing claims asserted here and reverse the District Court's grant of summary judgment.

## I

This is a case about eggs.  After collection from laying hens, most commercially-produced eggs proceed through one of two principal distribution channels.  The first path is for "shell eggs," which are supplied to grocery stores and other

distributors as whole eggs, packaged, for example, in crates by the dozen. "'Shell eggs' [are] defined as eggs produced from caged birds that are sold in the shell for consumption or for breaking and further processing." *In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. 171, 177 n.4 (E.D. Pa. 2015).

The second path involves what are referred to as "egg products." "'Egg products' [are] defined as the whole or any part of shell eggs that have been removed from their shells and then processed, with or without additives, into dried, frozen, or liquid forms." *Id.* at 177 n.5. Food manufacturers are the primary purchasers of egg products, using them as ingredients in goods ranging from frozen waffles to salad dressing to mayonnaise.

In a series of individual and class actions brought by purchasers of shell eggs and egg products, certain egg suppliers are accused of price-fixing in violation of the Sherman Act, 15 U.S.C. § 1. It is alleged that, between at least 1999 and 2008, these producers conspired to reduce the population of egg-laying hens, resulting in a reduced supply of eggs and, in light of the inelasticity of demand in the relevant markets, supracompetitive prices.[1]

---

[1] "Demand for a product is inelastic if the price can rise without a corresponding drop in demand." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 246 (3d Cir. 2001). As applied here, if "the demand for eggs is highly inelastic," as Appellants contend, then "a relatively small reduction in the egg supply results in a large increase in egg prices." (Opening

Appellee United Egg Producers, Inc. ("UEP"), a trade association, allegedly played an important role by coordinating a certification program. Egg producers participating in the certification program were required to increase their hens' cage sizes and refrain from replacing hens that died with another laying hen (a practice known as "backfilling"). It is alleged that the animal welfare rationale offered for these practices is merely a pretext for the true goal of reducing egg supply to drive up egg prices.

Appellants – Kraft Foods Global, Inc., Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. (hereinafter, "Plaintiffs" or "Purchasers") – are food manufacturers. They sued Appellees – UEP, as well as an exporting entity under UEP's control (United States Egg Marketers, Inc. ("USEM")), and five processed egg product suppliers[2] who made sales directly to the Plaintiffs – in the U.S. District Court for the Northern District of Illinois. The Judicial Panel on Multidistrict Litigation transferred the case to the U.S. District Court for the Eastern District of Pennsylvania, consolidating it for pretrial purposes with other cases involving similar antitrust claims (the "MDL").

---

Brief of Plaintiffs-Appellants ("OB") at 15)

[2] The five supplier Appellees are Rose Acre Farms, Inc., Ohio Fresh Eggs, LLC, Michael Foods, Inc. ("Michael Foods"), R.W. Sauder, Inc., and Cal-Maine Foods, Inc. (hereinafter referred to, together with UEP and USEM, as "Defendants" or "Suppliers").

6

Plaintiffs' claims are based solely on purchases of egg products; claims by purchasers of shell eggs are being litigated in other cases within the MDL. Plaintiffs seek to recover overcharges they paid in the market for egg products due to "substantially increased" prices resulting from Defendants' alleged participation in the supply-reduction conspiracy. (OB at 10)

More particularly, the Purchasers' theory is that the Suppliers conspired to reduce the supply of shell eggs, and to inflate the price of shell eggs, with the intent and effect of also artificially inflating the price of egg products. The Purchasers' view, which they contend is supported by their expert, is that the relevant market consists of shell eggs and egg products. Therefore, according to the Purchasers, the prices they paid for egg products – of which shell eggs are the main input – include overcharges, just as the conspiring Suppliers intended. (*See generally* JA416) (Plaintiffs' counsel arguing during summary judgment hearing, "[O]ur allegations and our proof are that the output-reduction conspiracy at the henhouse level impacted in the same way both shell eggs and egg products.")[3]

---

[3] In this Opinion we sometimes refer to shell eggs as the price-fixed product. At other times we refer to shell eggs as a price-fixed input into egg products, and describe egg products – the principal component of which is shell eggs – as a price-fixed good. For purposes of this Opinion, these descriptions are interchangeable. Plaintiffs allege, and have an expert who agrees, that Defendants intended to artificially inflate the prices of shell eggs and egg products by restricting the supply of eggs. (*See* OB at 10 ("The conspiracy was intended by defendants to

7

The Suppliers are vertically integrated to varying degrees. Thus, some proportion of the egg products purchased by Plaintiffs was made using eggs obtained from non-party, non-conspirator egg producers ("non-conspirator eggs"), with much or all of the remainder made from eggs sourced internally, from the Suppliers' own laying hens ("internal eggs").[4] A slightly altered version of a diagram prepared by the Purchasers depicts this arrangement:

raise market prices for both shell eggs and egg products."); JA248 (alleging that "Defendants agreed to control supply and artificially maintain and increase the price of eggs [i.e., all eggs]"); JA200 (specifying that term "'eggs' refers to both 'shell eggs' and 'egg products'"); JA749 ("[E]conomic theory and the documentary record indicate that firms that process egg products affect shell egg prices by seeking opportunities to divert eggs to the most profitable product, and vice versa. . . . Thus, anticompetitive actions to reduce the overall production of eggs will impact prices of all types of eggs analyzed in my report.")) While in some cases whether the price-fixed item is the complete product purchased by the plaintiff, or is instead merely a component of that product, may be relevant, resolution of the issues presented here is not impacted by this distinction. *See generally Weiss v. York Hosp.*, 745 F.2d 786, 815 (3d Cir. 1984) ("Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form.").

[4] In addition, certain Defendants obtained shell eggs from other conspirator-Defendants. These eggs are within the scope of what this Opinion refers to as "internal" eggs, as they were

8



The dashed line in the left box indicates that internal eggs are used as an input for the egg products purchased by Plaintiffs-Purchasers from Defendants-Suppliers. In addition, as represented by the dotted line running from the right box into the left box, those same egg products also contain some amount of non-conspirator eggs that are first purchased by Defendants-Suppliers from non-conspirator egg producers. Therefore, the egg products Plaintiffs purchased from Defendants contain some combination of internal eggs, supplied directly by Defendants, and non-conspirator eggs, supplied indirectly by non-conspirator egg producers.

---

produced within the conspiracy. For purposes of the issues before us, it does not matter whether a Defendant's "internal" eggs came from a flock owned by that same Defendant or instead from a flock that belonged to a fellow conspirator-Defendant.

9

During discovery, Plaintiffs' damages expert opined that (i) the relevant market included both shell eggs and egg products; (ii) small reductions in flock size and egg supply caused significant increases in egg prices, due to the market's high inelasticity of demand; and (iii) this increase also enabled Defendants to overcharge Plaintiffs for their purchases of egg products. Plaintiffs collectively claim aggregate damages in excess of $111 million.

Plaintiffs' damages calculations make no distinction between overcharges for egg products made using internal eggs and those made from non-conspirator eggs. Plaintiffs' expert testified at his deposition that the proportion of price-fixed egg products derived from non-conspirator eggs is irrelevant. In the view of Plaintiffs' expert, Defendants' conspiracy effected an increase in the market price of all shell eggs, regardless of their source. (*See* JA596-97) ("As documented . . . there are no close substitutes for eggs – regardless of whether one considers shell, liquid, dried, or frozen eggs. . . . A reduction in egg production means that fewer eggs are available for making/processing shell eggs or egg products.") Consequently, and as Defendants allegedly intended, Plaintiffs paid an overcharge on all of the egg products they purchased from Defendants, even if those egg products were made, in whole or in part, from non-conspirator eggs. (*See generally* JA749-50) ("[A]nticompetitive actions to reduce the overall production of eggs will impact prices of all types of eggs analyzed in my report. . . . The primary mechanism through which the alleged conspiracy impacted the prices of shell eggs and egg products was through coordinated efforts to reduce national flock size and the overall number of eggs generally . . . .")

After discovery concluded, Defendants moved for summary judgment. They argued that Plaintiffs' inclusion in their damages calculations of egg products made with non-conspirator eggs violated *Mid-West Paper*'s prohibition on "umbrella damages." Defendants emphasized that none of Plaintiffs' allegations involves any wrongdoing undertaken at the egg product production stage, but only concern the production of shell eggs at the laying stage. They also demonstrated that one defendant, Michael Foods, made the "overwhelming majority" of relevant egg product sales, and that most of the egg products sold by Michael Foods were made with non-conspirator eggs. (Joint Response Brief of Defendants-Appellees ("AB") at 10) In other words, it is undisputed that "a Michael Foods egg product most likely was manufactured using egg supplied by a non-conspirator." (*Id.* at 11)

Defendants also pointed to Plaintiffs' expert's acknowledgment that, "as of 2004, producers not alleged to be defendants or conspirators accounted for more than 45% of [hen] flocks in the United States." (AB at 12) (citing JA590) Further, according to Defendants, Plaintiffs' damages calculations do not reveal "whether the allegedly higher prices resulted from higher raw egg prices or higher processing margins." (AB at 14)

The District Court entered summary judgment for Defendants. It found that Plaintiffs lack antitrust standing because they impermissibly seek to "link the raw egg prices of non-conspirators to the conspiracy" in violation of *Mid-West Paper*, and, alternatively, their allegations run afoul of *Illinois Brick*'s bar on "recovery of pass through overcharges." (JA9-

11

10) Plaintiffs ask us to reverse the District Court's entry of summary judgment and remand the case for trial.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1337. Plaintiffs filed a timely notice of appeal on October 4, 2016. On October 6, 2016, we sought input from the parties as to whether "[t]he order appealed from . . . dismissed all claims as to all parties." In response, both sides agreed that, notwithstanding the pendency of other related cases in the MDL, the District Court's order that is the subject of this appeal resolved all claims brought by Plaintiffs and, therefore, was a final order immediately appealable under 28 U.S.C. § 1291. We agree. *See Gelboim v. Bank of America Corp.*, 135 S. Ct. 897, 904 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities, so an order disposing of one of the discrete cases in its entirety should qualify under § 1291 as an appealable final decision."). Therefore, we have appellate jurisdiction pursuant to § 1291.

## III

We review the District Court's order granting summary judgment *de novo*. In doing so, we "apply the same test the District Court should have used." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 246 (3d Cir. 2010). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We evaluate the record "in the light most favorable to the

12

nonmoving party and draw all inferences in that party's favor." *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011) (internal quotation marks omitted).

## IV

Section 4 of the Clayton Act allows one "injured in his business or property by reason of anything forbidden in the antitrust laws," such as price-fixing prohibited by the Sherman Act, to sue for treble damages. 15 U.S.C. § 15(a). Plaintiffs contend that the District Court erred in finding that they lack antitrust standing and their § 4 claims are barred by *Mid-West Paper* and *Illinois Brick*.[5] We agree.

## A

The term "standing" as used in the antitrust context is conceptually difficult and has not been delineated with precision. *See generally Associated Gen. Contractors of*

---

[5] Plaintiffs also contend that the District Court abused its discretion in "*sua sponte* rejecting [their] economic expert's opinions concerning the relevant product market and the impact of the alleged output conspiracy on the prices that [Plaintiffs] paid." (OB at 5**;** *see also id.* at 51-56) Any flaw in the District Court's assessment of Plaintiffs' expert's opinions stemmed from the District Court's assessment of the relevant case law. On remand, it will be for the District Court to determine whether to permit Defendants to renew or restate a challenge to Plaintiffs' expert's opinions and to decide the merits of any such attack. (*See infra* Section VI.C)

13

*California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536 (1983) ("*AGC*") ("There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages."). It is also something of a misnomer. For a party to have "antitrust standing," it must do more than satisfy the familiar three-part test for standing – "injury in fact, causation, and redressability," *see generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) – that arises from the constitutional requirement of a "case or controversy." *See AGC*, 459 U.S. at 535 n.31.[6] "The doctrine of antitrust standing requires a plaintiff to 'prove more than injury causally linked to an illegal presence in the market.'" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 263 (3d Cir. 2016) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Even a showing of antitrust injury – that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick*, 429 U.S. at 489 – is insufficient on its own to show antitrust standing to sue for treble damages under § 4 of the Clayton Act. *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 (1986).

---

[6] There is no dispute that Plaintiffs have met their burden to show constitutional standing. They allege they suffered an injury in fact by having to pay overcharges, which were caused by Defendants' anticompetitive price-fixing, and which could be redressed by a Court order awarding treble damages.

14

Instead, noting the breadth of § 4, courts have concluded that, rather than allowing "antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," *Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251, 262 n.14 (1972), the treble damages remedy should be "confine[d] . . . to those individuals whose protection is the fundamental purpose of the antitrust laws," *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 505 (3d Cir. 1976) (internal quotation marks omitted). There is no bright-line test. Instead, the Supreme Court has identified factors to be considered in determining if a plaintiff is a party entitled (under the particular circumstances of a specific case) to the protections of the antitrust laws. Based on the Supreme Court's opinion in *AGC*, we have extracted the following five-factor inquiry:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

> (4) the existence of more direct victims of the alleged antitrust violations; and

15

(5) the potential for duplicative recovery or complex apportionment of damages.

*See Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232-33 (3d Cir. 2013); *see also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 924 (3d Cir. 1999) (characterizing *AGC* as setting out six-factor test).

Therefore, determining whether Plaintiffs have antitrust standing to pursue their claims requires application of the *AGC* factors, based on an understanding of the most pertinent antitrust precedents. It is to those opinions that we now turn.[7]

**B**

The District Court's ruling turned on our *Mid-West Paper* decision and the Supreme Court's decision in *Illinois Brick*, and we discuss both cases in some detail below. Other cases must also be considered in order to place these two principal cases in the proper context.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Supreme Court considered a § 4 action brought by a shoe maker against a manufacturer of machinery that the shoe maker used in its operation. The manufacturer argued that the shoe maker was not injured by the manufacturer's anticompetitive conduct because the shoe

---

[7] Although all the cases we discuss in the next section predate *AGC*, they remain binding precedents, and their analyses of many of the factors later discussed in *AGC* are highly informative.

16

maker had passed on to its own customers any overcharge it had paid to the manufacturer. The Supreme Court rejected this "passing-on defense" on the basis that overcoming it would impose on antitrust plaintiffs a requirement of making "a convincing showing of . . . virtually unascertainable figures," resulting in the possibility that "those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them." *Id.* at 493-94. "Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories," which would unduly deter those suffering from antitrust injury, and embolden those inclined to commit antitrust violations. *Id.* at 493.

A decade after *Hanover Shoe*, the Supreme Court decided *Illinois Brick*, 431 U.S. 720. There, the State of Illinois and local governments claimed that concrete block manufacturers had engaged in a price-fixing conspiracy. Observing that the plaintiffs were "indirect purchasers of concrete block, which passes through two separate levels in the chain of distribution before reaching" the plaintiffs, *id.* at 726, the Supreme Court explained that *Hanover Shoe*'s prohibition on a "pass-on theory as a defense in an action by direct purchasers" likewise required a symmetrical ban on "offensive use of a pass-on theory against an alleged violator." *Id.* at 735. In so holding, the Court aimed to protect defendants from the "serious risk of multiple liability" that might result from allowing an unascertainably large number of disparate, indirect purchasers to bring antitrust claims. *Id.* at 730. Potential

17

liability would arise, instead, only from transactions defendants had with their direct customers. *See id.* at 745-47.[8]

Further, just as *Hanover Shoe* wanted to avoid burdening antitrust plaintiffs from nearly-impossible evidentiary challenges, *Illinois Brick* reflected the Supreme Court's "perception of the uncertainties and difficulties in analyzing price and out-put decisions in the real economic world . . . and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom." *Id.* at 731-732 (internal quotation marks omitted). The Court was concerned that allowing pass-on theories "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers." *Id.* at 737.

This Court was called upon to apply *Illinois Brick*'s teachings in *In re Sugar Industry Antitrust Litigation* (*Stotter & Co., Inc. v. Amstar Corp.*), 579 F.2d 13 (3d Cir. 1978) ("*Stotter*"). In *Stotter*, a candy wholesaler sued sugar refiners who allegedly conspired to fix sugar prices. The wholesaler had purchased candy (made with the price-fixed sugar) directly from one of the sugar refiners. The district court granted

---

[8] There are exceptions to *Illinois Brick*'s "indirect purchaser" rule – for "pre-existing cost-plus contract[s]" or circumstances where "the direct purchaser is owned or controlled by its customer," 431 U.S. at 736 & n.16 – but they are not relevant to the issues before us.

18

summary judgment to the refiners, finding that the wholesaler-plaintiff had not "pleaded or proved . . . that a conspiracy to fix sugar prices by the major refiners extends to their own sugar-containing products." *Id.* at 16 (internal quotation marks omitted). On appeal, the plaintiff argued – as the egg product Purchasers do here – that "if it cannot sue for the overcharge incorporated in candy brought about by the price-fixing of sugar, then no one can," and thus the refiner from whom it purchased candy would "escape liability for fixing the price of all the sugar it incorporated into candy." *Id.* at 17.

Judge Weis, in an eloquent and succinct opinion, explained why the plaintiff did not "run into an (Illinois) brick wall" and could, indeed, pursue its § 4 action. *Id.* at 15. While it was true that the product at issue – that is, the wholesaler's candy – "competes not with sugar, but with other candy, and more than one ingredient determines the price" of candy, this could not "be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator." *Id.* at 17. We distinguished *Illinois Brick* on the basis that the Supreme Court's concerns over complicated allocations of "overcharge among a number of entities in the chain" were not present. *Id.* at 18. "The difficulty in computation" in *Stotter* was "not in parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff." *Id.* This was a tolerable level of complexity. *See id.* Judge Weis also explained that denying recovery under the circumstances presented in *Stotter* "would leave a gaping hole in the administration of the antitrust laws" by allowing "the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element

19

into another product." *Id.* This Court, therefore, reversed the district court and permitted the wholesaler-plaintiff to proceed with its claim.[9]

Shortly after deciding *Stotter*, we were again tasked with applying *Illinois Brick*, this time in *Mid-West Paper*, which involved allegations of price-fixing by manufacturers of consumer bags. *See* 596 F.2d 573. One of the plaintiffs was a grocery store ("Murray") that used consumer bags to package its own products. Even though Murray purchased these bags from competitors of the price-fixing defendants – and not from the price-fixing defendants themselves – Murray argued that it had standing to pursue § 4 damages from the price-fixing defendants because it was the defendants' actions that allowed Murray's non-conspirator supplier to charge supracompetitive prices. *See id.* at 580-81; *see also id.* at 578 ("[W]e are required to assess whether *Illinois Brick* bars suits by purchasers from competitors of the antitrust defendants who allege that defendants' anticompetitive activity made it possible for their

---

[9] We came to the same conclusion more recently in *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002). There, the putative class plaintiffs purchased "corrugated sheets or boxes" directly from the defendants; these products were made with "linerboard that was subject to an agreement on output." *Id.* at 159. We held that, under *Stotter*, the plaintiffs – as direct purchasers from conspirators who had unlawfully raised the price of an input into finished products the conspirators themselves sold to plaintiffs – had antitrust standing. *See id* at 159-60.

competitors to charge higher prices, thereby injuring plaintiffs.").

We recognized that a "literal reading" of § 4's broad language might support Murray's contention. *See id.* at 581. However, we further observed that "§ 4 standing doctrine has been forged so as to confine the availability of treble damages to those individuals whose protection is the fundamental purpose of the antitrust laws." *Id.* (internal quotation marks omitted). In evaluating Murray's claim that it was harmed by the conspirators' creation of an "'umbrella' under which their competitors were able to charge higher prices than otherwise," we concluded that only a "tenuous line of causation" existed between the price-fixers' conduct and the prices Murray ultimately paid. *Id.* at 583. We also observed that, because Murray was not a direct purchaser from the price-fixers, "[t]he defendants secured no illegal benefit at Murray's expense." *Id.*

Additionally, as in *Illinois Brick*, it would have been difficult to trace Murray's alleged injuries to the price-fixers' conduct, or to prove that the price-fixers' competitors would not have charged the elevated price for reasons other than defendants' conspiracy. Comparing Murray's claim to *Illinois Brick*, we explained:

> [I]n both situations the plaintiff seeks to recover for higher prices set by, and paid by it to, parties other than the defendants. And the rationale underlying *Illinois Brick* [–] that it would be almost impossible, and at the very least unwieldy, to attempt to trace the incidence of the anticompetitive effect of defendants' conduct

21

[–] bears even greater truth in the context of a purchaser from a competitor of the defendants. For . . . it cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge.

*Id.* at 584.

We did not want to sanction the transformation of antitrust litigation "into the sort of complex economic proceeding that the *Illinois Brick* Court was desirous of avoiding if at all possible." *Id.* at 585. Hence, we concluded, Murray could not be considered among "those whose protection is the fundamental purpose of the antitrust laws." *Id.* at 583 (internal quotation marks omitted). Barring parties like Murray from recovering under an "umbrella theory," from antitrust conspirators with whom Murray had no direct relationship, would not undercut the goals of "depriv[ing] the violators of all the fruits of their illegality" or deterring further wrongdoing, but would instead efficaciously "concentrat[e] the entire award in the hands of the direct purchasers." *Id.* at 585 (internal quotation marks omitted). This would give direct purchasers "an incentive to sue" and "compensate[] those victims who are most likely to assume the mantle of private attorneys general for the injuries they suffered." *Id.*; *see also id.* at 578 n.9 ("[T]he [Supreme] Court has ensured that under all circumstances there will be an incentive for direct purchasers to sue, a factor that, in the Court's view, is necessary to promote effective enforcement of the antitrust laws . . . .").

22

**V**

In this case, the District Court applied *Mid-West Paper* and *Illinois Brick* and concluded that Plaintiffs lack antitrust standing. The District Court remarked that a significant proportion of the eggs used in the egg products purchased by Plaintiffs were non-conspirator eggs; that is, they had come from suppliers who were neither price-fixing conspirators nor defendants.

The District Court reiterated concerns it had raised in a previous ruling in a related case (also part of the MDL) regarding Defendants' opposition to a class certification motion. There, the Court had observed:

> '[T]he failure to investigate the effect of the eggs from non-defendants on the prices of egg products weighs against a finding that the conspiracy would have had a common impact on the members of the putative subclass, [because] non-conspiring producers might price their products differently than conspirators, [and these differences might be reflected] in the prices of egg products, even if sold by Defendants, meaning that certain subclass members might not have experienced an impact as a result of the conspiracy.'

(JA7-8) (quoting *Processed Egg*, 312 F.R.D. at 202 n.22)

As the District Court pointed out, "Plaintiffs' theory of the case is that Defendants conspired to reduce the supply of

23

eggs. This, in turn, raised the price of eggs, and, consequently, the price of egg products." (JA9) Given that "[a] significant proportion of the egg products at issue here is made with eggs purchased from non-conspirators," the absence of any analysis by Plaintiffs of what Defendants paid for non-conspirator eggs and how much of Defendants' egg products were made with those eggs rendered it "impossible to tell whether [or to what extent] the *Defendants* profited unduly from these egg products." (*Id.*) It seemed to the District Court that, instead, Defendants may have had to pay the non-conspirator egg producers a price that could have precluded Defendants from "reap[ing] ill-gotten gains from the egg products sales." (*Id.*)

In the District Court's view, because "Plaintiffs are relying on the theory that the conspiracy raised prices for all eggs, even those produced by non-conspirators," their claim "is a quintessential restatement of the umbrella theory" rejected in *Mid-West Paper*. (*Id.*) Alternatively, but also unavailing, the District Court found Plaintiffs' claims could be characterized as a combination of umbrella damages and a pass-on/indirect purchaser "problem" of *Illinois Brick*. (*Id.*) As the District Court saw it: "Attempting to link the raw egg prices of non-conspirators to the conspiracy is, under *Mid-West Paper*, too attenuated, and recovering overcharges when the Plaintiffs have not presented evidence that the Defendants, and not the non-conspirators, pocketed those overcharges creates a situation in which Plaintiffs are seeking recovery of pass-through overcharges, something prohibited by *Illinois Brick*." (JA9-10) Furthermore, despite Plaintiffs' insistence that "their expert has isolated the effects of the conspiracy on the prices of egg products," to the District Court the expert could not have done so "without any analysis whatsoever of the non-

24

conspirator egg producers' pricing decisions and without any knowledge of which eggs went into which egg products, and in what proportion." (JA10) Accordingly, because "Plaintiffs are indeed at odds with the 'umbrella' damages rule," the District Court granted summary judgment to Defendants. (JA4; *see also* JA10 n.4 (concluding Plaintiffs "cannot distinguish their damages theory from prohibited umbrella damages"))

## VI

### A

We have a different view than the District Court. While the District Court appropriately turned to *Mid-West Paper* and *Illinois Brick* as the most relevant precedents, we see this case as one in which the correct result is not compelled by either of these opinions – or, indeed, by any other. Instead, this case presents an issue of first impression. The novel issue is whether a direct purchaser of a product that includes a price-fixed input has antitrust standing to pursue a claim against the party that sold the product to the purchaser, where the seller is a participant in the price-fixing conspiracy, but where the product also includes some amount of price-fixed input supplied by a third-party non-conspirator.

Before answering that question, we first note that Plaintiffs plainly have antitrust standing to seek damages for overcharges for egg products made only with internal eggs. Relatedly, Plaintiffs have antitrust standing to seek damages for just the portion of the egg products they purchased that were made from internal eggs. These conclusions are

25

compelled by our holdings in *Stotter* and *Linerboard*. Just as the *Stotter* defendants were accused of fixing the price of sugar, and then incorporating price-fixed sugar into candy they sold directly to the *Stotter* plaintiff, Defendants here allegedly conspired to raise the price of shell eggs (by reducing supply), and then incorporated their price-fixed internal eggs into the egg products they sold directly to Plaintiffs. Like the plaintiff in *Stotter*, if Plaintiffs cannot sue for the overcharges they paid for egg products made with Defendants' internal eggs, no one can. *Cf. Stotter*, 579 F.2d at 18 ("[T]o deny recovery [here] . . . would leave a gaping hole in the administration of the antitrust laws . . . [by] allow[ing] the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product."). Moreover, any difficulty in computing damages arises not from "parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient." *Id.* This is a challenging task, but also one we found in *Stotter* to be amenable to litigation and worthy of the efforts of federal courts, and we again find so here.

We need not belabor these points. Defendants concede that, had Plaintiffs limited their claim to damages based only on the internal eggs used in the Defendants' egg products, Plaintiffs likely would have had antitrust standing. Plaintiffs have avoided limiting their claim in this manner and strongly prefer not to do so now. Nor does it appear that the parties asked the District Court to assess the viability of an antitrust claim based solely on egg products made from internal eggs.

**B**

As the Plaintiffs have chosen to pursue a claim for damages on all the egg products they purchased from the Suppliers, without regard to whether those egg products were made with internal eggs, non-conspirator eggs, or both, we must determine whether Plaintiffs have antitrust standing with respect to this broader claim. We hold that they do.

We do not view Plaintiffs' claim as "a quintessential restatement of the umbrella theory" of *Mid-West Paper*. (JA9-10) To be sure, there are similarities between the Purchasers' allegations here and those that were inadequate to create antitrust standing in *Mid-West Paper*. The Purchasers' claims, like those of Murray in *Mid-West Paper*, involve allegations that the conspiracy raised the price of a product that was produced both by conspirators and non-conspirators. This allegedly price-fixed product found its way into the injured parties' hands and, as in *Mid-West Paper*, the Purchasers seek to recover for overcharges for products whose manufacture involved non-conspirators. But the pertinent similarities between the Purchasers' claims and those rejected in *Mid-West Paper* end there.

Crucially, unlike the plaintiff in *Mid-West Paper*, who sued price-fixing suppliers *from whom it made no purchases and with whom it had no direct relationship*, here the Purchasers are pressing claims against price-fixing suppliers from whom they directly purchased products that incorporate a price-fixed component. While Murray, in *Mid-West Paper*, had to predicate its purported injuries on an "umbrella theory" – that is, that the price-fixing defendants' wrongful conduct

27

created an artificially high price "umbrella" under which *non-conspiring producers* from whom the plaintiff purchased also benefitted by charging higher prices – here the Purchasers' theory of injury is different, and simpler. *The Purchasers are suing the conspiring parties from whom they bought the price-fixed product.* The Purchasers were directly injured by wrongful conduct undertaken by their Suppliers.

The direct relationship between the Purchasers and their Suppliers, and the fact that the Suppliers are alleged price-fixing conspirators and not merely competitors of those conspirators, are key distinctions from the scenario we confronted in *Mid-West Paper*. *See In re Modafinil*, 837 F.3d at 264-65 ("*Mid-West Paper* reached its result because it wanted to ensure that only those who are most directly harmed by the anticompetitive conduct can sue to remedy the antitrust violation."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167-68 (3d Cir. 1993) (discussing *Mid-West Paper* and noting "all-important[] directness factor"). The plaintiff in *Mid-West Paper* was "not in a direct or immediate relationship to the antitrust violators," 596 F.2d at 583, and was "seek[ing] to recover for higher prices set by, and paid by [it] to, parties other than the defendants," *id.* at 584. Here, the Purchasers are in a direct relationship with the antitrust violators and seek to recover for higher prices set by those violators, and paid by the Purchasers to those very parties. These quite different facts render the Purchasers "among those

28

whose protection is the fundamental purpose of the antitrust laws." *Id.* at 583 (internal quotation marks omitted).[10]

Nor is the outcome here governed by *Illinois Brick*. Unlike Illinois and the other municipal purchasers of completed masonry structures and buildings from non-conspirators, who had only a highly attenuated relationship with the concrete manufacturer conspirators, Plaintiffs are in a direct purchaser relationship with the conspirator Defendants. Plaintiffs simply are not seeking to press an indirect purchaser antitrust claim: the egg products are alleged to be price-fixed, as the principal component of the egg products – shell eggs – is alleged to be price-fixed, regardless of whether those shell eggs are internal eggs or non-conspirator eggs. Moreover, unlike in *Illinois Brick*, here there appears to be no "serious risk of multiple liability" – Defendants can be sued by, and likely only by, direct purchasers, such as Plaintiffs – and the issues of proof and apportionment of damages are not of a magnitude that imposes intolerable "costs to the judicial system and the efficient enforcement of the antitrust laws." *Illinois Brick*, 431 U.S. at 730-32.

---

[10] Additionally, our holding in *Mid-West Paper* reflected reluctance to "expand the standing doctrine" in cases where complex economic analyses "are a prerequisite to establishing that the plaintiff has suffered compensable injury altogether." 596 F.2d at 585. That problem is not presented here. To the contrary, as noted above, the question of whether the Purchasers suffered *any* actionable harm is clearly resolved in their favor under *Stotter*.

Application of the *AGC* factors confirms the conclusion that Plaintiffs have antitrust standing to pursue their full claim. *See generally* 459 U.S. at 537-38; *see also Ethypharm*, 707 F.3d at 232-33. Plaintiffs allege a clear "causal connection between the antitrust violation and the harm to [them] and the intent by the defendant[s] to cause that harm." That is, Plaintiffs contend that Defendants drove up the price of shell eggs intending to likewise artificially inflate the price of egg products and then injured Plaintiffs by making them pay overcharges to Defendants. Further, Plaintiffs' "alleged injury" – that is, being made to pay higher prices – "is of the type for which the antitrust laws were intended to provide redress," and the injury allegedly flowed "direct[ly]" from Defendants to Plaintiffs. *See generally In re Modafinil*, 837 F.3d at 263 ("[D]irectness of injury is the focal point by which the remainder of the *AGC* factors are guided.") (internal quotation marks omitted). Also, there are no "more direct victims of the alleged antitrust violations," no "potential for duplicative recovery," and no "complex apportionment of damages" issues among various levels of injured parties. Our recognition here that direct purchasers, like Plaintiffs, have antitrust standing to sue conspirators, like Defendants, from whom they purchased a price-fixed product, does not make Defendants vulnerable to suit from downstream consumers – for instance, a purchaser of waffles made by Plaintiffs with Defendants' egg products – with whom Defendants have no relationship. To the contrary, if Plaintiffs cannot sue for the overcharges incorporated in the egg products they purchased, no one else can sue Defendants for these losses.

The Purchasers' antitrust standing does not turn on whether it is the Suppliers, as opposed to someone else, who

benefitted from the overcharges the Purchasers paid. Damages recoverable by a plaintiff on a § 4 claim do not depend on the ill-gotten benefit of the wrongdoer. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005). Instead, the "typical measure" of damages on such a claim is the overcharge paid by the plaintiff, that is "the difference between the actual price and the presumed competitive price multiplied by the quantity purchased." *Id.* (internal quotation marks omitted). Regardless of *who* actually collected the overcharge, the Purchasers' econometric analysis purports to show the "difference between the actual [supracompetitive] price and the presumed competitive price" of the egg products they purchased. This purported difference, and the Purchasers' resulting injury, was allegedly a direct and intended result of the Suppliers' conspiracy to reduce the supply of eggs and to artificially inflate the price of egg products.

In sum, we conclude that Plaintiffs-Appellants have antitrust standing to pursue overcharge damages from the Defendants-Appellees from whom they purchased egg products, regardless of whether those egg products were made with internal eggs, non-conspirator eggs, or both. Consequently, we reverse the District Court's grant of summary judgment to Defendants and remand for further proceedings.

**C**

We emphasize that our holding today is limited to determining that Plaintiffs have antitrust standing to pursue their claims. We conclude that the District Court's grant of

31

summary judgment due to lack of such standing was error.[11] We express no view as to the merits of Plaintiffs' claims. Nor have we reached any conclusion as to whether their claims may suffer from other flaws that may make this case amenable to resolution short of trial. Hence, while Plaintiffs ask us to "remand the case for trial" (OB at 56), we have not done so. Instead, it will be for the District Court to determine whether, given our conclusion that Plaintiffs have antitrust standing, this case should proceed to trial.

We recognized in *Mid-West Paper* that antitrust plaintiffs must prove "actual causation" with "reasonable certainty," and provide the trier of fact enough to "make a reasonable estimate of damages." 596 F.2d at 584 n.43 (internal quotation marks omitted). We reiterate these holdings. Our decision today does not consider whether Plaintiffs have made, or can make, a sufficient evidentiary showing on these elements to warrant presenting their claims to a jury. Similarly, it is for the District Court to decide whether to entertain any challenge to Plaintiffs' expert's econometric analysis under the familiar standard set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

---

[11] Defendants' motion for summary judgment was based solely on their theory that Plaintiffs lack antitrust standing due to their reliance on an invalid umbrella theory of damages. Consequently, the District Court's summary judgment opinion considered only that issue.

(1993),[12] and whether to grant any request it may receive from any party to expand the record in light of today's decision.

## VII

For the reasons given above, we find that Plaintiffs-Appellants have antitrust standing to pursue their Clayton Act § 4 claims. The District Court's grant of summary judgment to Defendants-Appellees is reversed. The case is remanded for proceedings not inconsistent with this Opinion.

---

[12] The District Court noted that "no party has challenged the admissibility of [Plaintiffs'] expert report or testimony." (JA5)